HOLMES v. DOWIE et al.

(Circuit Court, N. D. Illinois, E. D. July 27, 1906.)

No. 28,354.

1. PRINCIPAL AND AGENT—POWERS OF ATTORNEY—UNAUTHORIZED DEED BY ATTORNEY—RIGHTS OF GRANTEE.

A deed to property made by one holding a power of attorney from the legal owner in plain violation of the spirit and intent of the power, which was well known to both the grantor and grantee is ineffective to convey any interest.

[Ed. Note.—For cases in point, see vol. 40, Cent. Dig. Principal and Agent, §§ 556–563.]

2. TRUSTS—ENFORCEMENT IN EQUITY—PROPERTY COLLECTED FOR CHURCH PURPOSES.

Money or property contributed by his followers to the founder of a church, who is professedly engaged in extending and building up such church, cannot be claimed by him as his individual property, but is impressed with a trust which binds him as trustee to use it for such purpose, and such trust may be enforced in equity.

[Ed. Note.—For cases in point, see vol. 47, Cent. Dig. Trusts, §§ 43–46, 53.]

3. SAME.

Defendant Dowie founded a church known as the "Christian Catholic Apostolic Church." Using funds contributed by his followers and sympathizers, he purchased land in his own name, and laid out a city, which was settled chiefly by members of his church who built upon lots leased by him for the purpose. He built a tabernacle and established a bank and various industrial enterprises conducted by unincorporated companies, stock in which was purchased by his followers at his instance. With the consent of the members, he constituted himself the general overseer of the church, and assumed entire charge of all of its affairs. On many occasions he declared both to his congregation and publicly that all such enterprises were for the ultimate benefit of the church, and that the property was to be so held by himself and his successors. Large indebtedness having been contracted and dissensions having arisen in the church, suits were instituted for the appointment of a receiver, and to determine the right to the office of overseer, and also proceedings in bankruptcy by creditors against Dowie, which were by consent consolidated and heard together. *Held,* that ·Dowie was not the owner of the property individually, but held the same as trustee and so conducted the business, and was not therefore subject to bankruptcy proceedings on account of the indebtedness; that a receiver, not connected with the church, would be appointed to take charge of all of the property and business, and to operate the same for the benefit of the creditors and the church; and, there being a controversy as to the office of general overseer of the church, that an election by the members would be ordered, to be conducted under supervision of the court, there being no regulation of the church providing for his selection.

In Equity.

Stephen S. Gregory, for complainant.

P. C. Haley, E. C. Wetten and C. H. Pegler, for defendant Dowie.

Jacob Newman, C. E. Cleveland, Chas. Whitney, V. V. Barnes, and Chas. E. Lander, for Voliva, Granger and others.

LANDIS, District Judge. The bill of the complainant, Holmes, a citizen of Kentucky, seeks a decree declaring a trust of certain prop-

erty (situated principally in Zion City, Ill.,) standing on the 31st day of March, 1906, in the name of John Alexander Dowie. It is alleged that Holmes is and for several years has been the owner of some $3,000 worth of stock in several unincorporated associations engaged in commercial pursuits at Zion City; that down to the fall of the year 1905 these enterprises were under the domination and control of Dowie, as trustee for the Christian Catholic Apostolic Church, by virtue of investments in said associations of funds which had come into his hands as the head of the church; that in September of last year, Dowie, having suffered a stroke of paralysis, executed a power of attorney authorizing three inhabitants of Zion City (officers of the church), to manage the several business institutions referred to and to control all other property standing in Dowie's name; that in February, 1906, Dowie terminated this authority, and executed a power of attorney giving the defendant Voliva full power over the property; that on March 31, 1906, Voliva conveyed by deed and bill of sale all the property to the defendant Granger; that thereupon Voliva, Granger, and the other defendants, being officers of the church, assumed to suspend Dowie from his position as general overseer of the church, and to appoint Voliva in his place under the title of acting general overseer; that shortly thereafter, Dowie who, owing to ill health, had for several months been absent in Jamaica and Mexico, returned to Illinois, and filed a bill in the state circuit court of Lake county against Voliva, Granger, and others, alleging, among other things, that the property covered by Dowie's power of attorney to Voliva belonged to Dowie personally; that the conveyances by Voliva to Granger were in violation of Voliva's duties under the power, and a fraud upon Dowie's rights, and praying for a decree of conveyance by Granger to Dowie; that to this bill the defendants Voliva, Granger, and others filed an answer and exhibited a cross-bill, averring that the property represented the accumulations of years of contributions to Dowie as overseer of the church by persons who sympathized with his religious doctrines, and that such contributions were trust funds for the extension of the work of the church, and praying for a decree that the whole of said property is a trust estate for the use of the Christian Catholic Church: that at about this time certain persons claiming to be creditors of Dowie filed a petition in the United States District Court, alleging that Dowie was insolvent, had committed acts of bankruptcy by preferring other creditors, and praying that he be adjudged bankrupt; that to this petition Dowie answered by setting up his version of the development of the Zion City enterprises, including the establishment of the various business institutions, the execution of the several powers and conveyances above mentioned, and praying judgment of the court on the question of ownership: that thereupon the complainant and defendant in the state court proceedings joined in a stipulation transferring that cause to the United States District Court to be heard, and the rights of all parties determined in the bankruptcy matter.

The question of the District Court's jurisdiction under the stipulation having challenged the attention of the court, the Holmes bill was filed in the Circuit Court, and all parties have entered into an agreement

that the evidence heard in the District Court may be considered in determining the issues raised by Holmes' complaint in the Circuit Court, to which last-mentioned bill Dowie on the one hand, and Voliva, Granger, and their associates on the other, have answered in harmony with their respective contentions in the state court and District Court proceedings above referred to.

It appears that John Alexander Dowie, a native of Scotland, where he had been educated along theological lines, came from Australia to the Pacific Coast in 1888, and remained there a number of years engaged in church work. From there he came to Illinois, and after considerable time devoted to the same work in Chicago undertook the Zion City enterprise in 1899, in execution of a scheme conceived by him many years before; that in furtherance thereof he purchased a tract of land aggregating some 6,000 acres, a part of which was subdivided and laid out in park and residence property, provision being likewise made for manufacturing sites and for other commercial enterprises; that conveyances of lots were made to various persons by instruments in form of lease for 1,100 years, upon which lots dwelling houses have been erected by the grantees, accommodating a population of 6,000 or 7,000 people; that Dowie has constructed several school-houses at a cost of $25,000 each, buildings for higher educational purposes at an outlay of approximately $200,000, and a tabernacle for church services, seating 6,000 or 7,000 people; that a lace factory, soap works, candy factory, and other industrial enterprises have been established by Dowie, and furnish employment to the inhabitants, who are practically all members of the Christian Catholic Apostolic Church.

The financing of this scheme was accomplished in part by moneys received from purchasers under the 1,100 year leases. What these funds amounted to does not appear, but that a very substantial part of the capital used in the development of the plan was made up of money contributed to Dowie by persons outside of Zion City and living in various parts of the world, plainly appears from the evidence of Dowie, whose testimony on that subject is substantially as follows:

"I acquired this property by the generosity of good people throughout the world, very largely unconnected with the church, as well as connected with the church. I have looked upon the property as the result largely of my own good sense under God. I paid for the land only $250 per acre, an exceedingly low price, and have maintained a minimum selling price of approximately $3,000 per acre. I have carried on my land work through a land department, my law work through a law department, my general stores through a general stores department, my lace industries through a lace industries department, etc. The money came in the form of offerings and contributions from the same common source—the people all over the world, mostly outside of Zion City. I believe the property to be completely mine to do with as I please, and that no human being other than myself has any right, claim, or interest in it. I consider, however, that the way in which I got this property and the way in which I have it absolutely binds me, when I have ceased to control it, to put it in trust in perpetuity for the Christian Catholic Apostolic Church, so that it shall go down to generations to do good in that line, with the exception of 2½ per cent. which I think is fair for me and my family. I did think 5 per cent., but I have reduced it to 2½, and am somewhat inclined to reduce it more."

In response to an inquiry from the court as to the relation Dowie sustained to this property his senior counsel replied as follows:

"My understanding is that Dowie had the absolute legal title to the property. and that he always regarded himself as holding it in trust for the extension of the Kingdom of God, not that he believed Zion City owned that property or had any interest in it."

It may be observed here that a solution of this problem is not embarrassed in any respect whatever by Voliva's alleged conveyances to Granger, for the obvious reason that those conveyances were in plain violation of the spirit and intent of Dowie's power to Voliva, which both Voliva and Granger well knew. Moreover, they knew from a cablegram received shortly before the execution of the documents that Dowie had forbidden such conveyance. Therefore, as between Dowie, Voliva, and Granger, those instruments were mere waste paper. It is also to be borne in mind that there is a vast aggregate of pecuniary liabilities outstanding, a substantial portion of which is now past due. Included in these liabilities are purchase money notes secured by mortgages covering lands upon which the city stands, obligations to pay annuities to persons who have turned over to Dowie moneys and property, merchandise and other creditors, including labor claims of employés of the several Zion enterprises, as well as the demands of depositors of funds in the bank. Those conditions which had existed for many months before Voliva came to Zion City in February, 1906, resulted, as was to have been expected, in a curtailment, if not suspension, of commercial credit. Material had to be paid for in cash; the sale of the products of the several factories was restricted, and workmen were thrown out of employment. In short, there was commercial and industrial depression at Zion City. However, in my view of this case a detailed examination into the management of the business enterprises or a minute consideration of the vast aggregate of singularly acrimonious disputes with which the controversy has been burdened, would be wholly superfluous. During Dowie's sojourn in Australasia and on the Pacific Coast he received and devoted to the purposes of church and charity, according to his judgment, a large amount of money. Apparently he did not seek to amass a private fortune. When he reached Chicago, in 1893, he possessed in addition to a library, wearing apparel etc., only about $2,000. After he came here and down to the occurrence of the events which brought the parties before me he had a very large revenue made up of offerings and contributions from people all over the world, running in some years to as much as $250,000. This money was used by him for church and charity purposes as he saw the necessity or wisdom of such expenditures, and for the material development of Zion City. And he states that he engaged in secular occupations only as an incident to, or in aid of, the accomplishment of his main object, namely, the propagation of his religious doctrine. As Dowie himself expresses it, he earned money from secular pursuits "for God and humanity." Thus came about the laying out of Zion City and the establishment there of various industries and commercial enterprises for the temporal welfare of his followers, the ultimate pur-

pose of the whole plan being, however, the extension of the Kingdom of God in accordance with the Dowie theory.

It is a well-recognized principle of equity that where a person accepts money or property to be used by him for the benefit of some other person or persons, or for the advancement of some lawful enterprise, such money or property constitutes a trust estate. It is the function of a chancery court to ascertain whether or not a conveyance falls within this category. If it be determined that it does, it then becomes the duty of the court to prevent a diversion of the fund and to safeguard it for the object of the gift. This may be accomplished by the exercise over both persons and property of those broad powers which so characteristically inhere in a court of equity. The inquiry then is: Did these offerings come to Dowie for his private purse, or did the contributors intend that the fund should be directed to charitable or religious uses? If for any other purpose than the purely personal benefit of Dowie the estate is a trust. It is the duty of the court to get at the substance of the thing, and in ascertaining the purpose of the gift the court is not limited to an inspection of written documents or other specific declarations of the parties made at the time. If their relation is one of confidence, or if he who receives the gift is in a position of influence over him who makes the gift, as for instance, if the person receiving the money is the advocate of a religious faith, and by word and attitude and environment induces a conviction in the minds of large numbers of people that as an instrumentality of divine authority, he can and does relieve physical ills, and is clothed with power to exert an influence on the spiritual welfare of men and women, who thereupon give him of their lands and goods—surely, the motive of such gift ought not long to remain a matter of doubt in the minds of rational men. The fact that such contributions, amounting at times to as much as $250,000 in a single year, came to him in the form of checks and currency through the mail and by express, the contributor omitting to require the execution of a formal declaration of the trust, does not tend to divest the transactions of their real character. It is just as if a contributor sitting in a church pew had placed the funds on the collection plate passed to him by a deacon. Surely in such case the court would not decree that the parson might put the money in his pocket on the alleged score of no agreement to the contrary, merely because the contributor had failed to rise in his place and exact a pledge of trusteeship from the pulpit.

The Christian Catholic Apostolic Church is unincorporated. If it had been incorporated and John Alexander Dowie had thereupon been duly chosen as general overseer, and the contributions that went to the building up of this estate had come to such general overseer, clearly he could not have a decree of individual proprietorship. Can it be that the mere omission to incorporate changes his relation to the property, and that the general overseer of the unincorporated society is therefore to be adjudged the individual proprietor merely because of such omission? It would be difficult to conceive of anything more inherently inconsistent than Dowie's claim of private ownership and his admission of trust obligation for the spiritual

welfare of generations unborn. He says it is his own property, and yet he considers that because of the way he got it he is absolutely bound to turn it over to his successor in perpetuity for the church. Now, if he is to have a successor that necessarily implies his own representative capacity, for the individual man can have no successor; and if he must pass it to his successor how can he be at liberty to dispose of it otherwise in his own lifetime? If during his lifetime he were to divide it up among his followers, or devote it to some other secular purpose, as he may if it is his private fortune, his admitted obligation to future generations would be, by his own act, thus made impossible of fulfillment. Obviously, the theory advanced in his behalf is not sound.

Let us now examine what has been Dowie's own understanding of his relation to this estate as evidenced by his declarations before the events which caused this litigation. In his contracts with intending lessees of land at Zion City and with subscribers to the stock of the Zion Building & Manufacturing Association, unincorporated, he covenanted for himself and his successors. At a meeting in February, 1899, he inquired from the pulpit if any member of the congregation objected to his sole trusteeship, and no objection being voiced he thanked the congregation for their confidence in him. This was prior to the purchase of the land, and on an occasion when the Zion City venture was under consideration. In September, 1903, in a signed letter, published in Leaves of Healing, he asserted:

"Zion's business is God's business. Two million dollars of new capital required for the extension and development of the financial, commercial, and industrial undertakings of Zion City."

And he called upon his followers to realize by immediate sale the cash proceeds of all their property and come with all their house to Zion City and invest in Zion securities or Zion lands. At a church meeting held in November, 1903, he declared that "Zion, as a whole, has 95 per cent. of the money interest," and that he, Dowie, has 5 per cent. Again, in Leaves of Healing, November, 1904, he declared:

"This is my word to you: Zion is not my personal property. Get in, and get in with all you have."

Leaves of Healing was the official organ of the church, edited by Dowie, and used by him as his channel of communication with his followers and sympathizers all over the world. While a witness he declared that it would be difficult to exaggerate the power and importance of Leaves of Healing. The declarations quoted above, so communicated to his people, were made for some purpose. Manifestly, that purpose was to influence the minds of men and women possessed of property. That Dowie recognized that such persons were, in fact, so influenced by his importunities and declarations is evidenced by a codicil to his will executed in August, 1905, as follows:

"The remaining nineteen-twentieths of said estate in my name which I hold and have held in trust for said (Christian Catholic Apostolic) Church, I do

hereby give, devise and bequeath to my successor in office, to him and his successors in office, to be administered for said church and the extension of Zion and the Kingdom of God, in conformity with the rules of said church and pursuant to the teachings of the Lord Jesus Christ as expressed in the Holy Scriptures as understood and administered by such church."

There is no escape from the plain meaning of these words. The declaration is an unqualified and complete recognition of an existing trust obligation. No specious construction or refinement of reasoning could make anything else out of it, and for this court to enter a decree of private ownership would be to perpetrate a fraud. Counsel have offered in evidence a will executed by Dowie within the last few months, purporting to dispose of this property in a different way from that provided in the document from which the August codicil is quoted above, and it is argued that the subsequent will supersedes the former one. Of course, it is elementary that so long as a man lives he may change his will or revoke it altogether, and it is therefore entirely competent for Dowie to dispose of whatever individual property he may have in such way as will give effect to the last purpose his faculties enable him to conceive. But this is not the point involved here. While he may alter the disposition of his own property, the words of the 1905 codicil, solemnly declaratory of his trust relation to this property, once committed to paper and his signature attached, are beyond recall.

This estate is and must be held to be a trust for the Christian Catholic Apostolic Church. The appointment of a receiver to take possession and administer the property pending the entry of a final decree, and the designation of a permanent trustee, therefore, becomes necessary. Considering the ecclesiastical dispute which has cast a shadow across Zion City and its inhabitants, and bearing in mind the large variety of conflicting interests, this task is one of extreme delicacy. The position in which the people of Zion City find themselves at this time in respect of the question of employment is to my mind the most pressing consideration before the court. It is strongly insisted by counsel for the complainant Holmes and for the Voliva faction that the defendant Alexander Granger be continued in charge. This appointment it is asserted is an absolute necessity. I do not concur in this proposition. Waiving all questions of Granger's fitness or unfitness from the standpoint of business ability for this undertaking, some time ago he took a vow from which I quote the following:

"I vow in the name of God my Father and of Jesus Christ, His Son and my Saviour, and of the Holy Ghost who proceeds from the Father and the Son, that I will be a faithful member of Zion's Restoration Host, and I declare that I recognize John Alexander Dowie, General Overseer of the Christian Catholic Church in Zion in his three-fold prophetic office as a messenger of the Covenant, the Prophet foretold by Moses, and Elijah the Restorer. I promise to the full extent of all my power to obey all rightful orders issued by him, and that all family ties and obligations, and all relations to all human government shall be held subordinate to this vow. This I make in the presence of Almighty God."

It is not my duty to express my contempt for the man that could exact or take this oath, but I am not obliged to repose confidence in

a man so constituted that, living in this republic, he could serenely vow his readiness at all times to abandon his family and betray his country. I will not appoint Alexander Granger. In this connection it is due to the present membership of the church residing in Zion City to call attention to the fact that at a public meeting of the church held in Zion Tabernacle April 21, 1906, this so-called restoration vow was repudiated and abandoned. The receiver to be appointed must be a man of recognized business ability and absolute integrity, whose selection will at once inspire the confidence of the thousands of inhabitants of Zion City dependent for employment upon a rehabilitation of industrial enterprises at Zion City, and at the same time be notice to the financial world that, in future, the affairs of these concerns will be conducted in accordance with those sound business principles that must underlie all stable commercial development. He will also be under no obligation to anybody or any influence except this court for his appointment. And he will understand that the only way to discharge that obligation is by absolute fidelity to his trust. Thus he will be hampered in no possible way in the performance of his duties. No officer or employé in any capacity will be disturbed or retained because he is an adherent or official of the church. The man that does his work will be continued in his employment.

The question of the overseership of the church has to be considered. That officer will represent the religious organization for whose use the receiver will administer the trust estate. Wilbur Glenn Voliva is at present acting overseer. He was brought from Australia, where he occupied a subordinate position, and placed in charge at Zion City by Dowie, whose grave physical malady required him to sojourn in a southern clime. Without going into the merits or demerits of the several ecclesiastical contentions of the different factions, it is a fact that Voliva and his adherents assumed to suspend Dowie from the general overseership, in Dowie's absence, and without giving him a hearing. Charges gravely affecting Dowie's private character were made. An incident of the controversy was the suspension of Wilhite, Peters, and others from fellowship in the church, by a communication in the following language:

"Mr. Fielding H. Wilhite—Dear Brother in Christ: Inasmuch as you are aiding and abetting an officer of this church who has been suspended from his office and from fellowship, it becomes my duty to remove you from office and suspend you from fellowship in the Christian Catholic Apostolic Church in Zion for cause. Unless you turn from the error of your way it will be necessary to remove you from Fellowship. Praying to God to lead you to repentance, I am,

"Faithfully yours, in the Master's service,

"J. G. Excell, Ecclesiastical Secretary."

The punishment thus inflicted upon Dowie's followers as a penalty for their refusal to desert their leader so taints their proceedings with unfairness that common decency seems to require that some sort of orderly method, free from all possible coercion and duress, be employed to select a general overseer by a process which will leave his title free from cloud. It is the general rule that a court

148 F.—41

will recognize the action of a religious society in this respect, and this court does not assume to usurp the power of selection in the pending cause. It is for the organization itself to select its leader. Inasmuch, however, as it has no regulation providing how this shall be done, and in view of the fact that the church is domiciled in the United States, it seems fair to me that the majority rule should prevail. It is therefore ordered that on the third Tuesday of September next an election of a general overseer of the Christian Catholic Apostolic Church be held in the City of Zion, at which election all male and female members of that church over 21 years of age, who have continuously resided in Zion City since January 1, 1906, shall each be entitled to one vote. For the purposes of this election persons suspended for adhering to the Dowie faction will be considered members of the church. The election will be held in accordance with the laws of the state of Illinois, under what is known as the "Australian System." The court will designate officers of election to serve on the occasion named. The names of persons to be voted for will be certified to this court within 10 days from this day. If no more than one candidate be so certified this court, in dealing with the trust estate, will recognize such person as the legally chosen general overseer of the church. If more than one name is certified, such persons will have the use of the tabernacle at Zion City alternately during the period preceding the election. During such period the publication known as "Leaves of Healing" will be suspended by the printing office of this trust, save only that an edition will be gotten out at once containing in full the opinion of the court in the pending controversy, and the court directs that a copy of such publication be sent by those in charge of Zion Printing House to all subscribers and members of the church to whom Leaves of Healing have been forwarded or delivered since March 31, 1906. In due time the court will make suitable provision for the compensation of John Alexander Dowie on account of his services rendered in the development of this estate. This is not only in accord with the general understanding of all parties concerned in the fund, but is consonant with equitable principles, especially in view of the fact that the present value of the estate appears to exceed the contributions received.

An order will be entered in the bankruptcy matter of John Alexander Dowie in the District Court vacating the order adjudicating him a bankrupt, and dismissing the petition.