The STATE ex rel. PETRO, Atty. Gen., Appellee,

v.

GOLD et al., Appellees; ADSA, Inc. et al., Appellants.

The State ex rel. Petro, Atty. Gen., Appellee,

v.

Gold et al., Appellees; Charitable Resource Foundation, Inc., Appellant.

[Cite as *State ex rel. Petro v. Gold*, 166 Ohio App.3d 371, 2006-Ohio-943.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 04AP–863 and 04AP–873.

Decided March 2, 2006.

372

374

376

Jim Petro, Attorney General, Vivian P. Tate, and Samuel J. Kirk, Assistant Attorneys General, for appellee state of Ohio.

Swedlow, Butler, Lewis, Madison & Dye Co., L.P.A., and Michael D. Bonasera, for Jeffrey M. Lewis, receiver.

Victoria E. Ullmann, for appellants ADSA, Inc. and Larry Smith.

Kopech & Associates and David A. Kopech, for appellant Charitable Resources Foundation, Inc.

McGRATH, Judge.

{¶ 1} Defendants-appellants, Larry Smith, American Deputy Sheriffs' Association ("ADSA"), and Charitable Resource Foundation, Inc. ("CRF"), appeal from a July 30, 2004 judgment entry of the Franklin County Court of Common Pleas, which, after a bench trial, entered judgment in favor of plaintiff-appellee, the former Attorney General, Betty D. Montgomery ("the state" or "the Attorney General"). CRF also appeals the trial court's April 1, 2004 judgment entry, which denied CRF"s constitutional challenges to R.C. 1716.02(A)(2).

{¶ 2} Reduced to its essence, this action explores some of the legal parameters of R.C. Chapter 1716. Many of the issues presented on appeal, we believe, are questions of first impression. To facilitate a more complete understanding of the issues, it is first useful to briefly outline the statutory scheme involved and summarize the relationships between the parties, before proceeding to the facts, procedural history, and merits.

## I. R.C. CHAPTER 1716—OHIO'S CHARITABLE–SOLICITATIONS ACT

{¶ 3} In 1990, the Ohio General Assembly passed a comprehensive revision of the Ohio's charitable-solicitation laws, codified as R.C. Chapter 1716. The purpose of this chapter was to curtail fraudulent activities in the solicitation of charitable donations and ensure donor confidence by protecting the public against loss of charitable assets through fraud or mismanagement. Thus, "every officer, director, trustee, or employee" involved with the solicitation, collection, and/or expenditure of charitable contributions is considered a fiduciary and "as acting in a fiduciary capacity." R.C. 1716.17 and 1702.30(B) and (C).

{¶ 4} As relevant to this discussion, R.C. 1716.02(B) requires all nonexempt charitable organizations intending to solicit contributions in Ohio to register with the state. This statute requires a variety of information to be provided on the registration form, including names, addresses, and telephone numbers of the charity's executive personnel, annual financial report for the preceding fiscal year, and a statement regarding whether solicitations will be made directly or via another charitable organization, fund-raising counsel, or professional solicitors. If a third party, such as a professional solicitor,[1] will be soliciting donations on behalf of the charity, then the registration must also include a statement "setting forth the specific terms of the arrangements for salaries, bonuses, commissions, expenses, or other remunerations" that the professional solicitor will be paid. R.C. 1716.02(B)(9).

{¶ 5} Similar to the requirement for a charitable organization, R.C. 1716.07(B) requires professional solicitors to register with the state prior to soliciting donations. The registration application must be in writing and under oath, appear in the approved format, and be accompanied by a $200 fee. Id. It must also contain the name and address of each employee and agent working under its direction. Id. Additionally, the professional solicitor must obtain a surety bond

---

1. As defined in R.C. 1716.01(J), " '[p]rofessional solicitor' means any person who, for compensation, performs on behalf of or for the benefit of a charitable organization any service in connection with which contributions are or will be solicited in this state by the compensated person or by any person it employs, procures, or otherwise engages directly or indirectly to solicit contributions."

in the amount of $25,000, which must be approved by the state and filed at the time of registration or renewal. R.C. 1716.07(C).

{¶ 6} R.C. 1716.08(A) requires a written contract between a professional solicitor and a charitable organization that sets forth the obligations of each party and contains the percentage of the gross revenue that the charitable organization will receive from the charitable-solicitation campaign. That percentage must be expressed as either a fixed percentage of the gross revenue or a reasonable estimate thereof. R.C. 1716.08(A)(2).

{¶ 7} At the point of solicitation, a professional solicitor must advise the potential donor that he or she is being contacted by a professional solicitor, disclose the name of the professional solicitor as it appears on file with the state (as opposed to an acronym), and identify, by name and address, the charitable organization on whose behalf the contribution is being solicited. R.C. 1716.08(B)(1)(a) and (b). After receipt of a donation, a professional solicitor must deposit it within two days in a bank account held in the name of the charitable organization. R.C. 1716.08(F) and 1716.14(A)(11). Within 90 days following the completion of a charitable campaign, a professional solicitor must provide the charitable organization with a financial report of the campaign, including the gross revenue received and an itemized list of expenses; the report must also be filed with the Attorney General. R.C. 1716.07(E).

{¶ 8} Consistent with the statute's intent to curtail fraud, the General Assembly specifically empowered the office of the Attorney General to bring a civil action to enforce the provisions of R.C. Chapter 1716, in addition to its authority derived from common law. R.C. 1716.16(A). Following a judicial determination that a party committed a violation of R.C. Chapter 1716, the court can "make any necessary order or enter a judgment including, but not limited to, an injunction, restitution, or an award of reasonable attorney's fees and costs of investigation and litigation, and may award to the state a civil penalty of not more than ten thousand dollars for each violation of this chapter or rule." R.C. 1716.16(B). That provision also eases the restrictions for the Attorney General to seek injunctive relief, by removing the burden of demonstrating irreparable harm. Instead, the Attorney General need only show a violation of R.C. Chapter 1716 or that injunctive relief is in the public interest.

## II. THE PARTIES

{¶ 9} ADSA is a nonprofit Texas corporation that was formed in 1993. ADSA's purported purpose is that of a charitable organization, whose goal is to secure "a large membership base of county law enforcement employees" and assist that membership with equipment, training, scholarship assistance, and financial support, as well as provide death benefits to the families of its deceased members.

During the time period covered by the complaint, Smith was ADSA's president, executive director, chief executive officer, chief operating officer, and consultant.

{¶ 10} Mitchell Gold[2] was the officer, director, manager, agent, and owner of U.S. Marketing, a for-profit Nevada corporation, and North American Charitable Services ("NACS"), a for-profit California corporation (collectively referred to as "the Gold defendants" or "Gold and his companies"). As such, he formulated, directed, established, and controlled the policies, practices, and procedures of those companies. Both U.S. Marketing and NACS operated as professional solicitors as defined by R.C. 1716.01(J), soliciting contributions on behalf of ADSA in Ohio and other states.

{¶ 11} With assistance and direction from Gold, Jeffrey Atkins formed CRF, a for-profit Indiana corporation, in 1995. Like U.S. Marketing and NACS, CRF operated as a professional solicitor on behalf of ADSA, as well as for other charities, in Ohio and nationwide. CRF contracted with AdminiServe, Inc. to provide employees for its various charitable-solicitation campaigns. Pursuant to that contract, the individuals provided to CRF by AdminiServe, Inc., were considered the employees of CRF for the purposes of registration and compliance with R.C. Chapter 1716.

## III. PROCEDURAL HISTORY

{¶ 12} The state filed the instant action on November 26, 1999, alleging that Smith, ADSA, CRF, Gold, U.S. Marketing, and NACS had violated multiple provisions of R.C. Chapter 1716. On May 18, 2000, the trial court granted the state's motion for default judgment against the Gold defendants, neither of which had filed answers to the state's complaint or appeared in the action.

{¶ 13} The state moved for partial summary judgment against Smith, ADSA, and CRF, and, on August 30, 2001, the trial court granted that motion in part; the entry relative to that decision was filed on September 21, 2001. On December 3, 2001, a bench trial commenced on the remaining issues. The trial court subsequently issued its findings of fact and conclusions of law on July 30, 2004, finding that Smith, ADSA, and CRF had violated several provisions of R.C. Chapter 1716. That order also indicated that a receiver would be appointed over ADSA, and on August 24, 2004, the trial court appointed Jeffrey M. Lewis as the receiver for ADSA.

---

2. At the time of trial, Gold was indicted on charges of mail fraud in violation of Section 1341, Title 18, U.S.Code, and money laundering, in violation of Section 1956(a)(1)(A)(I), Title 18, U.S.Code. See D.C. No. CR–01–00150–DOC–1 and D.C. No. CR–01–00228–DOC–1. Gold was convicted, and on October 7, 2005, his convictions were affirmed. *United States v. Gold* (C.A.9, 2005), 145 Fed.Appx. 606, 2005 WL 2471045. Those criminal charges against Gold are unrelated to his misconduct in this case, although the alleged misconduct was the same.

{¶ 14} Prior to trial, CRF raised constitutional challenges to R.C. 1716.02(A)(2) in its trial brief. CRF argued that the statute was overly broad and acted as a prior restraint, thereby violating the First and Fourteenth Amendments to the United States Constitution. On April 1, 2004, the trial court issued a decision rejecting CRF's claims, finding that R.C. 1716.08(A)(2) was a disclosure statute that passed constitutional muster. In a separate entry filed that day, the trial court granted the state's motion to strike portions of CRF's reply brief on the grounds that certain exhibits attached thereto constituted new evidence not previously submitted.

{¶ 15} It is from the above orders that Smith, ADSA, and CRF appeal; Smith and ADSA jointly appealed. On September 9, 2004, this court sua sponte consolidated these appeals for purposes of record filing, briefing, and oral argument. For clarity and ease of discussion, however, we have addressed the substance of each appeal separately below.

## IV. SMITH AND ADSA

{¶ 16} The following relevant facts were adduced at trial. On June 6, 1997, Smith, acting on behalf of ADSA, entered into a five-year contract with U.S. Marketing ("1997 U.S. Marketing contract"), under whose terms U.S. Marketing agreed to solicit charitable contributions for ADSA in various states, including Ohio. This contract permitted U.S. Marketing to procure other fund-raising companies (second-level solicitors) on behalf of ADSA without first obtaining ADSA's prior approval and consent. It also authorized U.S. Marketing to open and maintain bank accounts in ADSA's name, and in return, U.S. Marketing was required to provide ADSA with monthly bank statements for those accounts. With respect to compensation, the contract guaranteed ADSA no less than $2,000 per week for five years, paid weekly.

{¶ 17} In a letter dated December 4, 1997, Gold advised Smith that due to legal action against U.S. Marketing, it would soon be operating under the guise of NACS. According to Smith, Gold explained that it would be "easier" and "less expensive" to change U.S. Marketing's name to NACS, as opposed to litigating the lawsuits that were pending against it.

{¶ 18} A series of correspondence between Smith and Gold clearly depicts a growing controversy as to U.S. Marketing's performance under the 1997 contract. In January 1998, Smith, prompted by a letter he received from Iowa's Attorney General concerning an unregistered professional solicitor acting on ADSA's behalf, wrote Gold addressing some concerns. Smith complained that he was still receiving literature from U.S. Marketing that contained the words "American Deputy Sheriffs Association, Inc.," despite having twice apprised U.S. Marketing that "NO literature" should use that name. Smith also admonished Gold

regarding the use of unregistered professional solicitors and reminded him that each professional solicitor who had subcontracted to work on ADSA's charitable campaign must be registered in the state where he is soliciting contributions. Smith included a request for certain information regarding the activities of those subcontractors to be forwarded to him. To that end, Smith explained that it was impossible for ADSA to "defend the fundraising actions of [Gold] or the subcontractors when ADSA, Inc. cannot identify what is being done, by whom, and in what states."

{¶ 19} In a subsequent letter dated March 6, 1998, Smith wrote Gold and reiterated a previous request for the following information: state registration certificates for all subcontracted professional solicitors acting on behalf of ADSA, a list of states in which U.S. Marketing and NACS were registered, a list of states in which the subcontracted professional solicitors were operating, and a proposed advertising script for ADSA's consideration. Smith also reminded Gold that ADSA had not received any bank statements relating to the accounts maintained by U.S. Marketing and NACS since December 1997 and requested copies of those statements.

{¶ 20} Three months later, on June 5, 1998, Smith again wrote Gold. In this letter, Smith conveyed the concern of Maureen Otis ADSA's attorney, that ADSA was receiving less than four percent of the gross revenue generated from solicitations. According to Otis, the disparity between the gross revenue raised and the percentage received by ADSA could not be justified to the IRS and could jeopardize ADSA's 501(c) status.

{¶ 21} Less than two weeks later, however, on June 16, 1998, Smith, acting on behalf of ADSA, executed a ten-year contract with NACS ("1998 NACS contract"). This contract contained many of the same provisions as the 1997 U.S. Marketing contract, including the authorization to execute contracts on ADSA's behalf without prior approval and permission to open and maintain bank accounts in ADSA's name. Under this contract, ADSA was guaranteed to receive no less than $3,000 per week for ten years, paid weekly.

{¶ 22} The problems with Gold and his companies persisted. Gold continued to hire professional solicitors that were not properly registered, licensed, or bonded. He also failed to provide ADSA with information it requested and failed to send copies of the monthly bank statements, as required by the 1998 NACS contract. Smith testified that he believed that Gold had subcontracted with as many as 7,500 professional solicitors without ADSA's endorsement.

{¶ 23} In fact, the dubious business practices of Gold and his companies came under scrutiny from the Federal Trade Commission ("FTC"). At some point in 1998, although the record is unclear as to the exact date, the FTC contacted Smith and advised him that it was conducting an investigation of Gold. Accord-

ing to Smith, although he had been previously concerned about Gold, the FTC's investigation was cause for greater concern and raised "a red flag." Smith cooperated with the FTC, supplying it with documents and information concerning Gold's involvement with ADSA, in the hopes that Gold's wrongdoings would be exposed.

{¶ 24} In a letter to Smith dated November 25, 1998, one of ADSA's attorneys, Bernard J. Greenrood Jr., cautioned Smith about ADSA's state of affairs. Greenrood expressed his opinion that ADSA's "fundraising methods" had placed it in a "very precarious position," and noted that despite previous discussions about the matter, "the situation" remained unresolved. Greenrood also warned Smith of the consequences ADSA could face as a result of its relationship with Gold and NACS, writing, "It is imperative you gain control of the funds being raised in the name of [ADSA] and see to it that they are distributed in a more equitable manner."

{¶ 25} Smith testified that he felt that Gold "was out of control." In a letter dated December 4, 1998, Smith canceled ADSA's 1998 contract with NACS. He then contacted the professional solicitors (those of which ADSA was aware) and advised them that ADSA had canceled its contract with NACS and that if they wanted to be paid, all checks should be sent directly to ADSA.

{¶ 26} Gold responded by sending a letter to those same solicitors. Therein, he alleged that ADSA had breached its contract with NACS and directed that all checks be sent to a new account for processing. He also enclosed a copy of a levy issued by the IRS against ADSA, which, Gold wrote, demonstrated "Larry Smith's history of not paying his or ADSA's obligations."

{¶ 27} Concerned that ADSA would lose its base of professional solicitors and, therefore, its source of income, Smith entered into a new five-year contract with NACS on January 4, 1999 ("the 1999 NACS contract"). This contract, like those preceding it, authorized NACS to outsource its solicitation duties. Unlike the other contracts, however, the 1999 NACS contract required ADSA to enter into a contract with any professional solicitor introduced to it by NACS. Compensation under the contract guaranteed that ADSA would receive no less than $3,500 per week, or five percent of the weekly deposits, whichever was greater.

{¶ 28} In February 1999, the FTC deposed Smith in its case against Gold. During his deposition, Smith was made aware that Gold had opened a bank account in ADSA's name, from which ADSA had received no funds. Smith subsequently learned that after ADSA terminated the 1999 NACS contract, Gold had formed his own organization called "American Deputy Sheriffs' Association, Inc." ("Gold's ADSA" or "the rival ADSA"). The purpose of Gold's ADSA was to facilitate the misappropriation of donations solicited for (the real) ADSA. As a

result of these discoveries, ADSA terminated the 1999 NACS contract on May 5, 1999.

{¶ 29} Although the details are not clear from the record, it appears that NACS instituted arbitration proceedings against ADSA because it had terminated the 1999 contract. NACS prevailed in arbitration, and, instead of proceeding to trial, ADSA elected to settle the matter. As part of the settlement it entered into with NACS, ADSA agreed to pay Gold $168,000, as well as enter into another contract with NACS in February 2000 ("the 2000 NACS contract"). Smith testified that the reason ADSA chose to settle with NACS and enter into the 2000 contract was so that ADSA could negotiate a contract with better terms. Contractual theory aside, Smith acknowledged that he did not have faith that Gold would live up to his responsibilities under the 2000 NACS contract. In July 2000, Gold began to withhold all payments to ADSA pursuant to the 2000 NACS contract.

{¶ 30} Gold's peculation of funds legally belonging to ADSA was undisputed, although the amount was incapable of determination. ADSA did not have any internal procedures to monitor the results of its charitable campaigns, nor did it have safeguards in place to detect fiscal irregularities. William R. Hulsey, a certified public accountant engaged by ADSA to conduct a financial audit for the period ending December 31, 1999, was unable to do so because ADSA had not adequately maintained its financial records and supporting data. ADSA's nebulous bookkeeping methods also precluded Hulsey from rendering an opinion as to the accuracy of ADSA's liabilities, assets, and gross revenue reflected on its 1999 balance sheet. It also caused the Form 990s[3] filed by ADSA for the years 1997, 1998, and 1999 to be amended. The adjustments made to the amended Form 990s disclosed significant discrepancies in gross revenue from that reported on the originals. The record also disclosed that at no time did ADSA provide any charitable benefits to any person or member in Ohio.

{¶ 31} Based on the above, the trial court made the following findings. It found that Smith and ADSA had violated R.C. 1716.02(A) and 1716.14(A)(12) when it authorized CRF to solicit charitable donations in Ohio on its behalf, during the period November 1, 1997, through April 5, 1998, although neither ADSA nor CRF was registered with the state. The court also had found Smith and ADSA had breached their fiduciary duties imposed by R.C. 1716.17 and the common law by (1) failing to "exercise reasonable care and oversight over the solicitation and business activities" of Gold and his companies, (2) failing to

---

3. A Form 990 is an annual reporting return that certain federally tax-exempt organizations must file with the IRS. It provides information on the filing organization's mission, programs, and finances.

institute "policies and procedures" to "ensure" that charitable solicitation campaigns would be conducted in accordance with law, (3) failing to fully account for charitable campaign proceeds and properly distribute benefits, and (4) failing to maintain proper financial records and data.[4]

{¶ 32} The trial court permanently enjoined Smith and ADSA from committing future violations and, pursuant to R.C. 1716.16(B), imposed fines against Smith in the amount of $20,000 and against ADSA in the amount of $16,000. The trial court also expressed its intent to appoint a receiver and ordered all charitable contributions or proceeds held in an express trust for the intended beneficiaries in the action. It further directed Smith and ADSA to relinquish possession and control of ADSA's charitable assets to the receiver upon appointment. On August 24, 2004, the trial court issued an order appointing a receiver, setting forth the receiver's specific duties.

{¶ 33} Smith and ADSA assert the following assignments of error:

[I] The trial court erred by appointing a receiver for an out of state non-profit corporation, which has neither offices nor assets in Ohio.

---

**4.** {¶ a} For the sole purpose of providing a broader view of ADSA's legal issues, we note the following state actions against ADSA. These cases are immaterial to this court's analysis and were not considered when rendering this opinion.

{¶ b} In May 1999, the Commonwealth of Pennsylvania's Department of State determined that ADSA was soliciting contributions in Pennsylvania without being registered with the department as required by law. It ordered ADSA to cease its solicitations until it registered or demonstrated that it was exempt from registration.

{¶ c} The trial court also heard brief testimony regarding the suit filed against ADSA by the Illinois Attorney General. The suit filed by the Illinois Attorney General, which was settled after trial in the case sub judice, alleged that ADSA solicited contributions in Illinois after ADSA's registration with the Attorney General had been canceled or rejected, falsely represented to potential donors that ADSA was composed of law enforcement personnel or that its solicitors were law enforcement personnel, filed false financial reports with the state, and failed to account for charitable contributions. *People v. ADSA* (2003), Ill. C.C. No. 00CH 07407. The suit was settled in February 2003, and as part of that order, ADSA stipulated to the following: its professional solicitors collected over $12 million from public solicitations, including Illinois citizens, from 1997 through May 2000; ADSA failed to file the statutory required annual accounting reports with the state; it solicited in Illinois after the Attorney General canceled its charitable registration; and it failed to properly maintain records for the years 1997 through 2000 and, as a result, was unable to file required reports and unable to meet the minimum audit filing requirements. ADSA agreed to a permanent injunction that prohibits ADSA, directly or through others, from soliciting, receiving, and holding charitable assets in Illinois; soliciting Illinois citizens; and using or allowing others to use any list it complied of Illinois donors; and agreed to pay a $10,000 fine.

{¶ d} On November 10, 2004, the Attorney General for the state of Iowa filed suit against ADSA and several of its professional solicitors, alleging violations of Iowa's consumer-fraud statute, Iowa Code Section 714.16. *State of Iowa ex rel. Miller v. ADSA* (Iowa Dist.Ct.2004), Polk Cty. No. CE 49813.

{¶ e} Some other suits involving ADSA have been brought by state Attorneys General in Texas, Connecticut, Oregon, North Dakota, and Mississippi.

[II] The trial court erred in determining that ADSA's script for telephone solicitation was false.

[III] The trial court erred in determining that Larry Smith violated his fiduciary duties.

[IV] The trial court erred in determining that ADSA has failed to fulfill its charitable obligations or otherwise failed to fulfill its fiduciary obligations.

[V] The trial court erred in creating an "express trust for the intended beneficiaries of this case" indicating that all monies collected nationally must be spent in Ohio.

[VI] The trial court erred by levying an excessive fine against ADSA, Inc. for failing to register with the attorney general's office.[5]

### A. The Trial Court Did Not Err in Appointing a Receiver

{¶ 34} ADSA argues in its first assignment of error that the trial court erred by appointing a receiver. Within this assignment of error, ADSA raises six subarguments, which we will address separately.

### 1. The trial court had jurisdiction to appoint a receiver

{¶ 35} In its first subargument, ADSA contends that the trial court's order appointing a receiver is void ab initio because it lacked in rem jurisdiction over ADSA's assets, all of which are located in Louisiana. ADSA concedes that the trial court had in personam jurisdiction but argues that the exercise of in personam jurisdiction did not "grant the authority to take control of [ADSA's] assets, which are in Louisiana[,] and forcibly move them to Ohio." In support of this argument, ADSA cites *Hanson v. Denckla* (1958), 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283, and two cases cited therein, *Rose v. Himely* (1807), 4 Cranch 241, 8 U.S. 241, 277, 2 L.Ed. 608; and *Overby v. Gordon* (1900), 177 U.S. 214, 20 S.Ct. 603, 44 L.Ed. 741.

{¶ 36} The state disputes ADSA's position that the trial court's appointment of a receiver rests upon the exercise of in rem jurisdiction. The state asserts that when a trial court has in personam jurisdiction over the parties, it may issue orders that affect property outside the forum state, citing *Riley v. New York Trust Co.* (1942), 315 U.S. 343, 353, 62 S.Ct. 608, 86 L.Ed. 885. Thus, the state contends that the trial court's jurisdiction to appoint a trust "is considered in personam and binding upon the parties to the action and those in privity with them." It also maintains that ADSA's reliance upon *Hanson,* supra, is misplaced. For the following reasons, we agree.

---

5. This assignment of error is misnumbered in ADSA's and Smith's brief, appearing as assignment of error No. 7.

{¶ 37} We begin our analysis by considering *Hanson,* a landmark case redefining the parameters of jurisdiction. In *Hanson,* a Pennsylvania domiciliary executed a deed of trust in 1935 to a Delaware trust company and delivered the corpus (corporate securities) to the trustee. In 1944, the settlor became a resident of Florida and remained so until her death in 1952. After the decedent's will was admitted to probate in Florida by devisees under the will, the executor instituted a declaratory judgment action in Delaware to determine who was entitled to participate in the trust assets held in Delaware. The Florida courts claimed jurisdiction over the Delaware trustee under a Florida statute permitting service of process by publication upon parties to a proceeding involving the construction of a will.

{¶ 38} The Supreme Court of the United States, in a sharply divided five-to-four decision, held that the nonresident corporate trustee lacked sufficient contacts with the state of Florida to warrant its subjection to the jurisdiction of the courts of that state. It was undisputed that the trust assets were located in Delaware, the trustee was a Delaware financial institution, and the transaction at issue occurred entirely outside Florida. The court held that Florida did not have in rem jurisdiction over the action involving the trust because

[w]hatever the efficacy of a so-called "in rem" jurisdiction over assets admittedly passing under a local will, a State acquires no *in rem* jurisdiction to adjudicate the validity of *inter vivos* dispositions simply because its decision might augment an estate passing under a will probated in its courts. * * * In analogous cases, this Court has rejected the suggestion that the probate decree of the State where decedent was domiciled has an *in rem* effect on personalty outside the forum State that could render it conclusive on the interests of nonresidents over whom there was no personal jurisdiction. *Riley v. New York Trust Co.,* 315 U.S. 343, 353 [62 S.Ct. 608, 86 L.Ed. 885]; *Baker v. Baker, Eccles & Co.,* 242 U.S. 394, 401 [37 S.Ct. 152, 61 L.Ed. 386]; *Overby v. Gordon,* 177 U.S. 214 [20 S.Ct. 603, 44 L.Ed. 741]. The fact that the owner is or was domiciled within the forum State is not a sufficient affiliation with the property upon which to base jurisdiction *in rem.*

(Footnote omitted; italics sic.) 357 U.S. at 248–249, 78 S.Ct. 1228, 2 L.Ed.2d 1283. In addressing in personam jurisdiction over the trustee, which the court remarked was appellee's "stronger argument," it explained that the Florida courts could not obtain in personam jurisdiction because the trust company lacked sufficient minimum contacts.

{¶ 39} We find that the case sub judice is easily distinguishable from *Hanson.* Most significant is that *Hanson* did not involve the appointment of a receiver by a court that had in personam jurisdiction over the entity placed into a receivership. Also, the corpus of the trust in *Hanson* had no relationship with Florida, whereas

here, contributions made by Ohio citizens in Ohio are included among ADSA's assets located outside of Ohio.

{¶ 40} The factual and legal differences between *Hanson* and the instant case render *Hanson* inapplicable to resolve the issue before us, and, therefore, *Hanson* does not support ADSA's argument. Because ADSA failed to provide any other citations of authorities to support its jurisdictional argument, it has not met its burden of affirmatively demonstrating error on appeal. App.R. 16(A)(7); *State v. McAdory*, Summit App. No. 21454, 2004-Ohio-1234, 2004 WL 510186, at ¶ 32. Notwithstanding, we will address the issue raised by ADSA's argument, which is whether a trial court that has in personam jurisdiction can, after judgment, appoint a receiver to operate, oversee, and administer the business and assets of a charitable organization when the assets are located outside the forum state.

{¶ 41} Although it is not cited by the parties, we find the case of *Rogers v. Webster* (C.A.6, 1985), 779 F.2d 52, unpublished opinion, text at 1985 WL 13788, helpful in determining this issue. Rogers, a citizen of Michigan, sued Webster, a citizen of Canada, for wrongful termination of employment. Judgment was entered against Webster for $1 million. To aid Rogers's execution of judgment, the district court appointed a receiver of Webster's assets and directed him to transfer all income and/or property in his possession and control to the receiver.

{¶ 42} In rejecting the same argument advanced herein by ADSA, which was that the court lacked jurisdiction to issue an order affecting assets located outside its territorial jurisdiction, the *Rogers* court opined:

> The fact that Mr. Webster's stock certificates and other items were situated outside the territorial reach of the District Court was immaterial, because that Court had jurisdiction of his person, and its order was directed at him, and not at the property itself. As was stated more than a century ago:

> "Where the necessary parties are before a court of equity, it is immaterial that the res of the controversy, whether it be real or personal property, is beyond the territorial jurisdiction of the tribunal. It has the power to compel the defendant to do all things necessary, according to the *lex loci rei sitae*, which he could do voluntarily, to give full effect to the decree against him.

> "Without regard to the situation of the subject-matter, such courts consider the equities between the parties, and decree in personam according to those equities, and enforce obedience to their decrees by process *in personam.*"

Id., quoting *Phelps v. McDonald* (1878), 99 U.S. 298, 308, 25 L.Ed. 473. Citing many cases in support, the *Rogers* court further explained:

> "[I]f a judicial proceeding is begun with jurisdiction over the person of the party concerned, it is within the power of a [court] to bind him by every

subsequent order in the cause," and this is true "whether the party remain within the jurisdiction or not." *Michigan Trust Co. v. Ferry*, 228 U.S. 346, 353, 33 S.Ct. 550, 552, 57 L.Ed. 867 (1913). Since the District Court retained herein personal jurisdiction over Mr. Webster, it had the power clearly to order him to deliver his personal property to the clerk or receiver, "whether the property be within or without the United States." *United States v. First National City Bank*, 379 U.S. 378, 384, 85 S.Ct. 528, 531, 13 L.Ed.2d 365 (1965) (bank ordered to freeze accounts located outside the United States). Accord *In re Feit & Drexler, Inc.*, 760 F.2d 406, 414, 415 (2d Cir.1985) (order requiring delivery of property located outside the court's jurisdiction, including Swiss bank accounts, to escrow agent); *Inter–Regional Financial Group, Inc. v. Hashemi*, 562 F.2d 152 (2d Cir.1977), cert. denied, 434 U.S. 1046, 98 S.Ct. 892, 54 L.Ed.2d 798 (1978) (defendant ordered to deliver to clerk stock certificates located in other states and other countries); *United States v. Ross*, 302 F.2d 831 (2d Cir.1962) (defendant ordered to deliver to receiver his shares in a wholly-owned Bahamian corporation); cf. *Steele v. Bulova Watch Co.* (1952), 344 U.S. 280, 289, 73 S.Ct. 252, 257, 97 L.Ed. 319 (1952) ("Where, as here, there can be no interference with the sovereignty of another nation, the District Court in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiction.") cf. *New Jersey v. City of New York*, 283 U.S. 473, 482, 51 S.Ct. 519, 521, 75 L.Ed. 1176 (1931) ("The situs of the acts creating the nuisance, whether within or without the United States, is of no importance. Plaintiff seeks a decree in personam to prevent them in the future.").

■ {¶ 43} As applied to the case sub judice, *Rogers* and the cases cited therein compel the conclusion that the trial court, by virtue of having in personam jurisdiction over ADSA, had the authority to appoint a receiver. In so holding, we reject the position taken by ADSA that the instant action is one in rem. As the Ohio Supreme Court explained in *Moss v. Std. Drug Co.* (1953), 159 Ohio St. 464, 470, 50 O.O. 389, 112 N.E.2d 542 "[a]ctions in rem are usually defined as proceedings against property itself, or as is said, directed primarily against things themselves. Actions in personam are proceedings directed against the person to recover personal judgments." Here, the allegations in the state's complaint are directed at the conduct of ADSA and Smith and not at ADSA's assets. The fact that a receiver was appointed, pursuant to the state's prayer for equitable relief, does not convert this action into one about property. See, e.g., *Fall v. Eastin* (1909), 215 U.S. 1, 11, 30 S.Ct. 3, 54 L.Ed. 65 ("When the subject-matter is situated within another state or country, but the parties are within the jurisdiction of the court, any suit may be maintained and remedy granted which directly affect and operate upon the person of the defendant, and not upon the subject-matter, although the subject-matter is referred to in the decree, and the

defendant is ordered to do or to refrain from certain acts toward it, and it is thus ultimately but indirectly affected by the relief granted"); *Groza–Vance v. Vance,* 162 Ohio App.3d 510, 521, 2005-Ohio-3815, 834 N.E.2d 15 (holding that "a court may exercise its in personam jurisdiction to order a party to convey property located outside the state and that such an order does not act directly upon title to the out-of-state property"), citing *Breitenstine v. Breitenstine* (Wy.2003), 62 P.3d 587; *TWE Retirement Fund Trust v. Ream* (2000), 198 Ariz. 268, 8 P.3d 1182; *Gen. Elec. Capital Corp. v. Advance Petroleum, Inc.* (Fla.App.1995), 660 So.2d 1139; *Cole v. Manning* (1926), 79 Cal.App. 55, 248 P. 1065; *Matarese v. Calise* (1973), 111 R.I. 551, 305 A.2d 112. Accordingly, we find that the concept of in rem jurisdiction has no play in this case.

{¶ 44} Based on the foregoing, we hold that the trial court had jurisdiction to appoint a receiver.

### 2. The Internal–Affairs Doctrine Is Inapplicable

■ {¶ 45} In its second subargument, ADSA asserts that the trial court's appointment of a receiver is contrary to law because the appointment interferes with ADSA's internal affairs. In support, ADSA cites *Relief Assn. of Union Works, Carnegie Steel Co. v. Equitable Life Assur. Soc.* (1942), 140 Ohio St. 68, 23 O.O. 290, 42 N.E.2d 653, paragraph two of the syllabus, which provides:

> Courts of Ohio are without jurisdiction to entertain an action against a foreign corporation where the result of granting the relief asked would be to interfere with the management of such corporation or the exercise by the board of directors of such corporation of a discretion vested in them by the laws of the state of creation or domicile of the corporation.

According to ADSA, the above holding renders the trial court's appointment of a receiver in violation of Ohio law.

{¶ 46} The state asserts that the internal-affairs doctrine applies only to disputes within a corporation or those affiliated within its corporate structure, and not to dispute between a corporation and a third party and, therefore, that it is inapplicable here. Consequently, ADSA's reliance upon *Relief Assn. of Union Works* is misplaced.

■■ {¶ 47} "The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands." *Edgar v. MITE Corp.* (1982), 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (internal-affairs doctrine not implicated in transfer of stock by stockholders to a third

party), citing Restatement of the Law 2d, Conflict of Laws (1971) 307–308, Section 302, Comment *b*. According to this doctrine "the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation." *First Natl. City Bank v. Banco Para el Comercio Exterior de Cuba* (1983), 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46, citing Restatement of the Law 2d, Conflict of Laws (1971), Section 302, Comments *a* and *e;* cf. *Cort v. Ash* (1975), 422 U.S. 66, 84, 95 S.Ct. 2080, 45 L.Ed.2d 26. "Different conflicts principles apply, however, where the rights of third parties external to the corporation are at issue." *First Natl. City Bank,* 462 U.S. at 621, 103 S.Ct. 2591, 77 L.Ed.2d 46, citing Restatement of the Law 2d, Conflict of Laws (1971), Section 301; Hadari, The Choice of National Law Applicable to the Multinational Enterprise and the Nationality of Such Enterprises (1974), 1 Duke L.J. 15–19. See, also, *Roselink Investors, L.L.C. v. Shenkman* (D.N.Y.2004), 386 F.Supp.2d 209, 225 ("Creditors' claims at issue here are tort claims regarding the rights of 'third parties external to the corporation' as they are not brought by shareholders, officers or directors, nor are they brought derivatively on behalf of the corporation. Therefore, the 'internal affairs doctrine' is inapplicable here"); *NatTel, L.L.C. v. SAC Capital Advisors* (Sept. 16, 2005), D.Conn. No. 3:04cv1061, 2005 WL 2253756.

{¶ 48} Against this background, we consider *Relief Assn. of Union Works.* The factual underpinnings of that case involved a contract dispute between appellant, a mutual life insurance company incorporated under the laws of New York, and appellee, a member of appellant's corporation. The contract at issue, an insurance policy, was governed by the laws of New York. Given the intracorporate relationship between the parties, the nature of the dispute, and its governance by New York law, it is easy to see how the case lent itself to the application of the internal-affairs doctrine. Those determinative factors, however, are absent from this case. There is no intracorporate relationship between the state and ADSA, or the equivalent thereof. Also, the dispute at hand involves alleged violations of Ohio law. Therefore, this case regards the rights of "a third part[y] external to the corporation." *First Natl. City Bank,* 462 U.S. at 621, 103 S.Ct. 2591, 77 L.Ed.2d 46.

{¶ 49} Based on the foregoing, we hold that the internal-affairs doctrine has no application in the case sub judice.

### 3. ADSA Waived Any Jurisdictional Argument as It Relates to Its Solicitors

{¶ 50} Next, ADSA asserts that with the exception of CRF, the trial court lacked jurisdiction to order ADSA's other professional solicitors "to send all the money to the receiver." ADSA contends that the state failed to serve them with

process, thereby divesting the trial court of jurisdiction. The state counters by arguing that ADSA waived these affirmative defenses, as ADSA and Smith failed to raise them in their answers. It also maintains that naming each fundraiser was not required, because the receiver "stands in ADSA's shoes."

{¶ 51} As previously explained, the burden of affirmatively demonstrating error on appeal rests with the party asserting error. App.R. 9 and 16(A)(7); *State ex rel. Fulton v. Halliday* (1944), 142 Ohio St. 548, 27 O.O. 487, 53 N.E.2d 521. Pursuant to App.R. 16(A)(7), an appellant must present his or her contentions with respect to each assignment of error and the reasons in support of those contentions, including citations of legal authorities and parts of the record upon which the appellant relies. An appellate court may disregard arguments if the appellant fails to identify the relevant portions of the record on which the errors are based. App.R. 12(A)(2). "[F]ailure to comply with the rules governing practice in the appellate courts is a tactic which is ordinarily fatal." *Kremer v. Cox* (1996), 114 Ohio App.3d 41, 60, 682 N.E.2d 1006.

{¶ 52} In this case, ADSA has failed to comply with the foregoing appellate requirements. First, it does not cite the place in the record upon which it relies. Second, it fails to cite any legal authority in support of its argument. Given that ADSA's argument, on its face, appears contrary to law, citation of case law was most necessary.

{¶ 53} The state is correct in that the receiver "stands in ADSA's shoes." A receiver is an officer of the court and "succeeds to the title and rights of action of the corporation itself, and takes all such rights as the corporation itself originally had, and may enforce them by the same legal remedies." *Smith v. Johnson* (1898), 57 Ohio St. 486, 488–489, 49 N.E. 693. Indeed, donations solicited by a professional solicitor on behalf of a charity lawfully belong to that charity. Considering these conclusions, we fail to understand the rationale behind ADSA's jurisdictional argument. Even assuming that the trial court ordered ADSA's professional solicitors to send the donations they solicited directly to the receiver, that order would be consistent with the preexisting legal obligations of those professional solicitors. R.C. 1716.08(B) highlights this point—all donations received by a professional solicitor must be deposited into the *charity's bank account* within two days. Thus, there is no real difference between a professional solicitor depositing donations into the bank account of a charitable organization and sending them to a receiver who has control over that bank account.

{¶ 54} Based on the foregoing, ADSA has failed to meet its burden in demonstrating error on appeal.

4. **R.C. 1716.16(B) and 2735.01(C), (D), and (F) Allow for a Receiver to Be Appointed in This Case**

 a. **R.C. 1716.16(B)**

{¶ 55} In its fourth subargument, ADSA argues that the trial court placed ADSA "into receivership based upon an exceedingly broad reading of R.C. 1716.[16(B)]."[6] According to ADSA, the trial court erred by interpreting the phrase "any other order" found in that statute to include the "extraordinary act of taking control of an out of state entity and forcibly moving it to Ohio." Thus, it is ADSA's position that if the legislature had intended to confer authority upon a court to appoint a receiver, it would have expressly stated so. The state responds by arguing the phrase "any necessary order" is broad enough to include a receiver. The receiver described ADSA's interpretation of R.C. 1716.16(B) as an example of "erroneous logic."

{¶ 56} R.C. 1716.16(B) provides:

> Upon a finding that any person has engaged or is engaging in any act or practice in violation of this chapter or any rule adopted under this chapter, *a court may make any necessary order or enter a judgment including, but not limited to,* an injunction, restitution, or an award of reasonable attorney's fees and costs of investigation and litigation, and may award to the state a civil penalty of not more than ten thousand dollars for each violation of this chapter or rule. In seeking injunctive relief, the attorney general shall not be required to establish irreparable harm but only shall establish a violation of a provision of this chapter or a rule adopted under this chapter or that the requested order promotes the public interest.

(Emphasis added.) Resolution of the issue before us turns upon whether an order appointing a receiver can be considered "any necessary order." In deciding, we must apply the rules of statutory construction and look to legislative intent. Accordingly, our review is de novo. *BP Exploration & Oil, Inc. v. Ohio Dept. of Commerce,* Franklin App. No. 04AP–619, 2005-Ohio-1533, 2005 WL 736145.

{¶ 57} When a word or phrase has not been defined by the legislative enactment in which it is found, by court decision, or otherwise, it will be given its common, ordinary, and accepted meaning, absent an indication of legislative intent to the contrary. R.C. 1.42; *Kimble v. Kimble,* 97 Ohio St.3d 424, 2002-Ohio-6667, 780 N.E.2d 273; *Coventry Towers, Inc. v. Strongsville* (1985), 18 Ohio St.3d 120, 122, 18 OBR 151, 480 N.E.2d 412; *Baker v. Powhatan Mining Co.*

---

**6.** Although ADSA cited R.C. 1716.17 in its brief, the trial court clearly premised its appointment of a receiver upon R.C. 1716.16(B).

(1946), 146 Ohio St. 600, 606, 33 O.O. 84, 67 N.E.2d 714; *Caygill v. Jablonski* (1992), 78 Ohio App.3d 807, 812, 605 N.E.2d 1352. The word "any" "has a variety of meanings, and depending upon how used, may mean 'all' or 'every' as well as 'some' or 'one.'" *Donohue v. Zoning Bd. of Appeals* (1967), 155 Conn. 550, 556, 235 A.2d 643, citing Words and Phrases (Perm.Ed.) 3A. See, also, Black's Law Dictionary (6 Ed.Rev.1990) 94. Applying these definitions in the context of R.C. 1716.16(B), the conclusion to be drawn is that by choosing the word "any," the General Assembly chose to vest Ohio courts with broad powers with respect to orders. Cf. *Mgt. Council of Wyoming Legislature v. Geringer* (Wy.1998), 953 P.2d 839, 844. Clearly, if the General Assembly had meant to preclude a court from entering certain types of orders, it could have chosen to do so. But it did not. Instead, it chose general language broad enough to include an order appointing a receiver.

{¶ 58} We find that this conclusion is also supported by the grammatical structure of R.C. 1716.16(B). The language "[u]pon a finding that any person has engaged or is engaging in any act or practice in violation of this chapter" directly precedes "a court may make any necessary order." Thus, when read in context, the plain meaning of the statute is clear: upon judicial determination that a party violated R.C. Chapter 1716, the court may fashion any order it deems necessary.

{¶ 59} Further buttressing our interpretation is that after the phrase "any necessary order" appears, the statute then lists certain types of orders or judgments a court may enter, but expressly states that a court is not "limited to" those remedies. "The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" *BedRoc Ltd., L.L.C. v. United States* (2004), 541 U.S. 176, 124 S.Ct. 1587, 1593, 158 L.Ed.2d 338, quoting *Connecticut Natl. Bank v. Germain* (1992), 503 U.S. 249, 253–254, 112 S.Ct. 1146, 117 L.Ed.2d 391. Because the General Assembly did not exclude the appointment of a receiver in R.C. 1716.16(B), we will not infer that exclusion.

{¶ 60} With respect to legislative intent, "[i]f the statute's language reasonably permits an interpretation consistent with that intent, we should adopt it." *F. Hoffmann–La Roche Ltd. v. Empagran S.A.* (2004), 542 U.S. 155, 174, 124 S.Ct. 2359, 159 L.Ed.2d 226. Here, the General Assembly enacted R.C. Chapter 1716 to curtail fraudulent activities in connection with the solicitation of donations and protect the public from unscrupulous operators. It also chose not to restrict the Attorney General to the procedures prescribed in R.C. Chapter 119 and expressly dispensed with several of the prerequisites for injunctive relief. By increasing the authority of the Attorney General, the chief legal executive officer for the state, the General Assembly has evidenced its intent to aggressively

prosecute violations of R.C. Chapter 1716. Thus, we find that our interpretation is consistent with legislative intent.

{¶ 61} For the foregoing reasons, we hold that R.C. 1716.16(B) empowers Ohio courts to appoint a receiver.

### b. R.C. 2735.01

{¶ 62} The trial court also found that R.C. 2735.01 supported the appointment of a receiver, although it did not identify which specific subsection was applicable. ADSA, however, contends that the possible situations in law or equity for appointment of a receiver listed in R.C. 2735.01 do not apply here, because ADSA is solvent and can satisfy the fines assessed against it.

{¶ 63} The state responds by arguing that the appointment of a receiver was supported by R.C. 2735.01(C) and (F). Specifically, the appointment of a receiver was needed to carry the trial court's judgment into effect, R.C. 2735.01(C), and given ADSA's and Smith's fiscal mismanagement, the appointment of a receiver was permissible as a form of equitable relief under R.C. 2735.01(F).

{¶ 64} Weighing in on the issue, the receiver asserts that "given that the findings of the trial court included failures on the part of [ADSA] to know the amount of gross revenue being generated by charitable solicitation campaigns inside [Ohio,] as well as failures to properly account for and spend the monies derived from these campaigns, the appointment of a receiver to effectuate the goals of R.C. 2735.01(C), (D) could not be more appropriate or authorized."

{¶ 65} In exercising its discretion to appoint or refuse to appoint a receiver, the trial court "must take into account all the circumstances and facts of the case, the presence of conditions and grounds justifying the relief, the ends of justice, the rights of all the parties interested in the controversy and subject matter, and the adequacy and effectiveness of other remedies." *State ex rel. Celebrezze v. Gibbs* (1991), 60 Ohio St.3d 69, 73, 573 N.E.2d 62. When reviewing a trial court's order in a receivership matter, an appellate court will not disturb a trial court's ruling absent an abuse of discretion. *Victory White Metal Co. v. N.P. Motel Sys.*, Mahoning App. No. 04 MA 245, 2005-Ohio-2706, 2005 WL 1300785, at ¶ 55–56; *Campbell Investors v. TPSS Acquisition Corp.*, 152 Ohio App.3d 218, 2003-Ohio-1399, 787 N.E.2d 78, ¶ 15.

{¶ 66} R.C. 2735.01 is a procedural statute and is to be liberally construed. *DiSanto v. Velotta & Velotta* (June 21, 1978), Summit App. No. 8753, 1978 WL 215232, citing *Stark Cty. Agricultural Soc. v. Walker* (1929), 34 Ohio App. 558, 171 N.E. 422. This statute provides:

A receiver may be appointed by the supreme court or a judge thereof, the court of appeals or a judge thereof in his district, the court of common pleas or

a judge thereof in his county, or the probate court, in causes pending in such courts respectively, in the following cases:

\* \* \*

(C) After judgment, to carry the judgment into effect;

(D) After judgment, to dispose of the property according to the judgment, or to preserve it during the pendency of an appeal, or when an execution has been returned unsatisfied and the judgment debtor refuses to apply the property in satisfaction of the judgment;

\* \* \*

(F) In all other cases in which receivers have been appointed by the usages of equity.

{¶ 67} In this case, ADSA's and Smith's fiscal mismanagement served as the motivating force behind the trial court's appointment of a receiver. In that regard, the trial court found that neither Smith nor ADSA knew "the gross revenue and expenses being generated by the solicitation campaigns being conducted for ADSA's behalf." Indeed, neither Smith nor ADSA was aware of the amount of money raised by Gold and his companies for ADSA or of how much money had been diverted from (the real) ADSA to the rival ADSA. Similarly, neither Smith nor ADSA could substantiate whether the weekly five percent of gross revenue it was entitled to under the 1999 NACS contract was ever received. Further, as made known by Hulsey's report, ADSA did not appropriately maintain its financial records and supporting data. As a result, the trial court charged the receiver it appointed with the duty to determine "the amount of charitable contributions that has been misspent, misappropriated, or unaccounted for."

{¶ 68} Given the above, we do not find that the trial court abused its discretion in appointing a receiver pursuant to R.C. 2735.01. The trial court ordered an accounting of ADSA, and it was not unreasonable to conclude that a receiver would be necessary to effectuate that goal. Thus, we find merit in the state's position that without a receiver, "there will be no effective mechanism to conduct a thorough financial review of ADSA." Further, given the fiscal misconduct and mismanagement of ADSA, it was not unreasonable for the trial court to conclude that the appointment of a receiver was necessary to preserve ADSA's assets during the appellate phase of this case.[7] These reasons also support the appointment of a receiver as an equitable remedy.

---

7. In reviewing the pleadings contained in the files accompanying this appeal, we note that on November 16, 2005, the trial court issued an order finding Smith and ADSA in contempt of its orders issued July 20, 2004, and August 24, 2004—the same orders at issue in this appeal. The trial court's recent order played no role in our analysis, and we make no judgment

{¶ 69} We therefore conclude that clear and convincing evidence exists to support the court's order appointing a receiver pursuant to R.C. 2735.01, specifically, subsections (C), (D), and (F). See, e.g., *Ratliff v. Ratliff* (Aug. 18, 1998), Franklin App. No. 97APF10–1294, 1998 WL 514039; *Ross v. Belden Park Co.* (Dec. 4, 1995), Stark App. No. 1995CA00045, 1995 WL 768586; *In re Estate of Utterdyke* (Dec. 11, 1992), Portage App. No. 92–P–0031, 1992 WL 366889; *Page v. AEI Group, Inc.* (Apr. 30, 1991), Franklin App. No. 90AP–151, 1991 WL 70126 (construing R.C. 1707.27 and 2735.01); *Phoenix Portland Cement Co. v. Shadrach* (1924), 18 Ohio App. 264; *Tonti v. Tonti* (App.1951), 118 N.E.2d 200, 66 Ohio Law Abs. 356; *Holmes v. Dowie* (N.D.Ill.1906), 148 F. 634.

{¶ 70} Based on the foregoing, we hold that R.C. 1716.16(B) and 2735.01(C), (D), and (F) provide for the appointment of a receiver in the case sub judice.

### 5. The Appointment of a Receiver Did Not Violate Due Process

{¶ 71} The trial in this matter occurred in 2001, and in 2004, the trial court issued its decision to appoint a receiver. ADSA contends that the appointment of a receiver three years after trial violated due process because the trial court did not have evidence reflecting ADSA's current financial affairs. In support, ADSA cites *Greene v. McElroy* (1959), 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377. Both the state and the receiver, however, contend that there could be no due process violation because a trial was held in the instant matter.

{¶ 72} At the onset, we note that ADSA has failed to support its argument with legal authority, in contravention of App.R. 16(A)(7). *Greene,* supra, did not involve the due process rights of a party for whom a receiver has been appointed. Rather, that case dealt with the revocation of an aeronautical engineer's security clearance because of secret testimony concerning his ex-wife's association with the Communist Party and with whether he was entitled to traditional due process standards of confrontation and cross-examination, since the revocation rendered him unable to practice his chosen profession.

{¶ 73} With respect to the merits of ADSA's argument, ADSA has failed to demonstrate that the trial court's appointment of a receiver three years after the trial violated its due process rights. It offers no information or otherwise explains how the delay in time made any difference. Therefore, we reject ADSA's argument that a delay between a trial and the issuance of an order appointing a receiver is prima facie evidence of a violation of due process rights. Indeed, despite notice that the state was seeking the appointment of a receiver,

---

regarding the merits of the allegations upon which the trial court relied and make no determination as to the order itself.

ADSA failed to address this issue during trial or at any time after trial and before the appointment of a receiver.

{¶ 74} We also note that several Ohio courts have held that an evidentiary hearing is not necessary before the appointment of a receiver. See, e.g., *Victory White Metal Co. v. N.P. Motel Sys.*, 106 Ohio St.3d 1545, 2005-Ohio-5343, 835 N.E.2d 727, at ¶ 53; *Maynard v. Cerny*, Summit App. No. C.A. 21652, 2004-Ohio-955, 2004 WL 383995, at ¶ 13; *Golick v. Golick* (1983), 9 Ohio App.3d 106, 108, 9 OBR 159, 458 N.E.2d 459 ("we cannot say as a matter of law that the trial court abused its discretion in appointing a receiver and ordering the sale of the stock without a hearing"); *Ratliff*, supra ("a receiver is permitted to hold and sell property without holding a hearing on the matter").

{¶ 75} Based on the foregoing, we hold that the trial court's appointment of a receiver did not violate ADSA's due process rights.

### 6. ADSA Has Waived Its Commerce Clause Argument

{¶ 76} For the first time in its reply brief, ADSA argues that the appointment of a receiver violated the Interstate Commerce Clause. ADSA contends that this issue is properly before this court, despite being first raised in its reply brief, because "the harm did not occur until the receiver seized assets out of state and interrupted the flow of commerce[,] which did not occur until after appellant filed its brief." That contention, however, is belied by the allegations articulated by ADSA in support of its motion for stay (filed September 10, 2004), supplement to motion to stay showing irreparable harm (filed September 14, 2004), and its writ of prohibition to the Supreme Court of Ohio (filed September 28, 2004)—all of which were filed prior to ADSA's appellate brief. Moreover, ADSA has not cited any case that held that the appointment of a receiver violated the Interstate Commerce Clause. Therefore, this court declines to address this issue because it is not properly before us.

{¶ 77} Based on the foregoing, we hold that the trial court had jurisdiction to appoint a receiver pursuant to R.C. 1716.16(B) and 2375.01. The appointment of a receiver did not violate ADSA's due process rights, and the internal-affairs doctrine has no applicability in the matter before us. We further conclude that the issues of personal jurisdiction relating to ADSA's professional solicitors and the Interstate Commerce Clause are not properly before us for consideration. Accordingly, we overrule ADSA's first assignment of error.

### B. The Trial Court's Finding that the Script Approved by ADSA Was Deceptive and Was Not Against the Manifest Weight of the Evidence

{¶ 78} In its second assignment of error, ADSA contends that the trial court erred when it found that ADSA's solicitation script created the false

impression that the donor's contribution would provide a local benefit. ADSA acknowledges that there was a "variety of testimony" that established that professional solicitors made "false or misleading statements to potential donors" but argues that ADSA should not be held responsible for a script it did not approve. ADSA further asserts that the word "American" in its name should put a potential donor on notice that it is a national charity and not a local one.

{¶ 79} The state argues that the script approved by ADSA was deceptive because use of the personal and possessive pronouns contained within the script created the impression that there would be a local benefit. That impression, however, was false because at no time did ADSA provide any benefit to Ohio law enforcement personnel or their families.

{¶ 80} The script considered by the trial court and approved by ADSA provides:

"The American Deputy Sheriff's Association, Inc." (ADSA) a non-profit organization was formed in 1993 to respond to the needs and challenges that face our County law enforcement officers. ADSA assists families of officers that have been killed in the line of duty protecting you and your family.

The trial court determined that this script was false and misleading based on the trial testimony of several witnesses, all of whom were led to believe that their donations would benefit their local sheriffs.

{¶ 81} We review this assignment of error according to the manifest-weight standard. In reviewing a trial court's judgment following a bench trial, "an appellate court is 'guided by the presumption' that the trial court's findings are correct." *Broadstone v. Quillen*, 162 Ohio App.3d 632, 637, 2005-Ohio-4278, 834 N.E.2d 424, citing *Patterson v. Patterson*, Shelby App. No. 17–04–07, 2005-Ohio-2254, 2005 WL 1074809, at ¶ 26, quoting *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 79–80, 10 OBR 408, 461 N.E.2d 1273. Thus, this court may not substitute its judgment for that of the trial court and must affirm the judgment if it is supported by some competent, credible evidence going to the essential elements of the case. *Reilley v. Richards* (1994), 69 Ohio St.3d 352, 632 N.E.2d 507; *Koch v. Ohio Dept. of Natural Resources* (1994), 95 Ohio App.3d 193, 642 N.E.2d 27.

{¶ 82} Given the evidence and the trial court's province to assess the credibility of witnesses, we cannot say that the trial court erred in finding that ADSA's script was false and misleading. "Our" is the possessive pronoun of we, which means "you and I." Based on that meaning, we cannot say that it was unreasonable for the witnesses, who were donors or potential donors, to understand from the solicitation that ADSA was providing or would provide assistance to their local law enforcement because these were the officers that protected

them and their families. Further, ADSA's argument that the word "American" should have put the donor or potential donor on notice that ADSA was a national charity and not a local one rings hollow because even national charities, such as the American Red Cross, often provide assistance to address the needs of a specific geographical community.

{¶ 83} Based on the foregoing, we find that the trial court's conclusion that the script was false and misleading was not against the manifest weight of the evidence. Therefore, we overrule ADSA's second assignment of error.

### C. The Trial Court's Finding that ADSA and Smith Breached Their Fiduciary Duties Was Not Against the Manifest Weight of the Evidence

{¶ 84} In their third and fourth assignments of error, ADSA and Smith contend that the trial court erred in finding they each breached their fiduciary duties. According to Smith, he exercised due diligence in discharging his responsibilities to ADSA by hiring "attorneys and other advisors to assist [with] contractual and registration matters." He also claims that he conducted an investigation of Gold and determined that Gold had no criminal convictions.[8]

{¶ 85} ADSA maintains that R.C. Chapter 1716 does not "place any duty on a charity to control its solicitors." Nor was it under a duty to "know and learn everything about the activities of its agents"; rather, its duty was limited to that which it could discover using due diligence. Thus, according to Smith and ADSA,

---

8. {¶ a} Independent research has disclosed that Gold was the subject of several law enforcement actions. In June 1999, the Fourth Appellate District of California decided the case of *People v. Orange Cty. Charitable Servs.* (1999), 73 Cal.App.4th 1054, 87 Cal.Rptr.2d 253. In that case, California's Attorney General filed suit against Gold, who owned Orange County Charitable Services, for fraudulent conduct in connection with charitable solicitations.

{¶ b} In another case involving Gold, *Fed. Trade Comm. v. Gold* (S.D.Cal.1998), No. SA cv 98–968 DOC, the comments made by Commissioner Orson Swindle are enlightening, "I find the present case against the Golds to be the rare and exceptional case in which a permanent ban on all charitable solicitation is warranted. The defendants' pattern of recidivism and their sheer disregard for the law are appalling. Mitchell Gold, Herbert Gold, and their fundraising companies have been subject to *a series of law enforcement actions dating back to 1992.*" (Emphasis added.) Statement of Commissioner Orson Swindle, 2003 FTC LEXIS 35. He also noted that "[s]ix states filed separate, successive lawsuits prior to the Commission's complaint [against Gold] in November 1998." Id. at fn. 2. Additional information regarding the Federal Trade Commission action against Gold, U.S. Marketing, and NACS, filed in 1998, can be found on its website (www.ftc.gov/opa/1998/11/misgiving-pr.htm).

{¶ c} The trial court did not rely upon these cases to refute the claims of Smith and ADSA that they did not breach their fiduciary duties, and, therefore, neither did we. We do note, however, that these cases strongly undermine Smith's and ADSA's claims that they exercised "due diligence" and "ordinary prudence" in their investigation of Gold and their decisions to renew ADSA's relationship with NACS, during the time when the Gold defendants were involved in litigation because of their business practices.

the trial court "assumed a 'blame the victim mentality' in finding that [Smith or ADSA] could have controlled Gold's actions." .

{¶ 86} The state, on the other hand, contends that it would be a "stretch of the imagination" to conclude that ADSA and Smith met their fiduciary duties. It argues that both Smith and ADSA breached their fiduciary duties by failing to oversee the activities of Gold and the professional solicitors hired by the Gold defendants, even after learning of Gold's misconduct. The state also notes the fiscal mismanagement of ADSA as further evidence of Smith's and ADSA's breach.

{¶ 87} "Every person who solicits, collects, or expends contributions on behalf of a charitable organization or for a charitable purpose, or who conducts a charitable sales promotion, and every officer, director, trustee, or employee of that person who is concerned with the solicitation, collection, or expenditure of those contributions shall be considered a fiduciary and as acting in a fiduciary capacity." R.C. 1716.17. The standard of care required of those considered fiduciaries can be found in R.C. 1702.30(B). That statute requires fiduciaries to perform their duties in good faith, in a manner reasonably believed to be in or not opposed to the best interests of the organization, and with the care that an ordinarily prudent person in a like position would use under similar circumstances. A fiduciary will not be found to have failed to perform his or her duties unless it is proved by clear and convincing evidence that the fiduciary has not acted in good faith, in a manner inconsistent with the best interests of the corporation, or without the care that an ordinarily prudent person in a like position would exercise in similar circumstances. R.C. 1702.30(C).

{¶ 88} In this case, the trial court determined that Smith and ADSA breached their fiduciary duties in violation of R.C. 1716.17 by failing to "exercise reasonable care and oversight over the solicitation and business activities of Gold, U.S. Marketing, and NACS and the professional solicitors and fundraisers they employed or procured to solicit contributions on ADSA's behalf." It further found that Smith and ADSA breached their fiduciary duties by "failing to institute policies and procedures for ADSA to ensure solicitations [made on its behalf] would be conducted legally and the proceeds fully accounted for and properly distributed."

{¶ 89} In making those determinations, the trial court considered Smith's trial testimony and several joint trial exhibits, which culminated in the following factual findings: (1) Smith and ADSA failed to know or timely learn the identities and addresses of all professional solicitors hired by Gold to solicit donations on behalf of ADSA, (2) Gold may have hired as many as 7,500 solicitors fundraising on behalf of ADSA, without ADSA's endorsement, (3) Smith and ADSA did not know in what states professional solicitors were acting on ADSA's behalf, (4)

Smith and ADSA failed to comply with the registration requirements of various states, including Ohio, (5) Smith and ADSA were unaware of the gross revenue and expenditures generated by ADSA's solicitation campaigns, (6) there were substantial discrepancies between the original Form 990s and the amended Form 990s (and the accuracy of the amended 990s Form was still in question), (7) Hulsey's report evidenced Smith's and ADSA's inaccurate and incomplete record-keeping, (8) Smith and ADSA continued to execute new fundraising contracts with NACS, especially the 2000 NACS contract, despite Smith's belief that Gold would not honor this agreement, and (9) neither Smith nor ADSA knew whether ADSA had received the amounts due from U.S. Marketing and NACS contracts, pursuant to ADSA's agreement with these companies.

{¶ 90} The record showed that despite the plethora of problems and concerns Smith had with Gold and his companies, which started soon after the 1997 U.S. Marketing contract, ADSA and Smith continued to do business with Gold and kept renewing that relationship. The correspondence between Smith and Gold depicts the eventual breakdown in relations. The report of Hulsey clearly demonstrated ADSA's fiscal mismanagement and poor recordkeeping. Given the evidence and the trial court's province to assess the credibility of witnesses, we cannot say that the trial court erred in finding that Smith and ADSA breached their fiduciary duties.

{¶ 91} Based on the foregoing, we find that there was clear and convincing evidence to support the trial court's conclusion that Smith and ADSA breached their fiduciary duties, and, therefore, this conclusion was not against the manifest weight of the evidence. Thus, we overrule ADSA's third and fourth assignments of error.

### D. ADSA Failed to Comply with App.R. 16(A)(7) with Respect to Its Fifth and Sixth Assignments of Error

{¶ 92} In its fifth argument, ADSA takes issue with the portion of the trial court's order that states:

All charitable contributions or proceeds currently in the possession or control of ADSA and Smith, whether individually or jointly held or controlled, are held in an express trust for the intended beneficiaries in this case. ADSA and Smith shall turn over possession and control of all such charitable assets to the Receiver appointed pursuant to paragraph H of this Order.

ADSA understands this portion of the trial court's order to mean that all funds collected on behalf of ADSA must be spent "only in Ohio."

{¶ 93} In its sixth assignment of error, ADSA argues that the fine imposed by the trial court was excessive because the state was aware of CRF's solicitation efforts on behalf of ADSA and it did not advise ADSA that its failure

to register CRF was in violation of R.C. 1716.02 and 1716.14. It also contends that "no harm was done as the state was on notice."

{¶ 94} As we have previously explained, the burden of affirmatively demonstrating error on appeal rests with the party asserting error. App.R. 9 and 16(A)(7); and *State ex rel. Fulton v. Halliday* (1944), 142 Ohio St. 548, 27 O.O. 487, 53 N.E.2d 521. It is not the duty of this court to search the record for evidence to support an appellant's argument as to alleged error. *Slyder v. Slyder* (Dec. 29, 1993), Summit App. No. 16224, 1993 WL 548760; *Sykes Constr. Co. v. Martell* (Jan. 8, 1992), Summit App. No. 15034, 1992 WL 2919. It is also not appropriate for this court to construct the legal arguments in support of an appellant's appeal. "If an argument exists that can support this assignment of error, it is not this court's duty to root it out." *Cardone v. Cardone* (May 6, 1998), Summit App. No. 18349, 1998 WL 224934.

{¶ 95} Having reviewed ADSA's fifth and sixth assignments of error, we find both to be unsupported and unmeritorious, as it has failed to provide any evidence or cite any legal authority in support. Indeed, we agree with the state in that the language cited by ADSA in its fifth assignment of error cannot reasonably be construed to mean that all contributions or proceeds collected by ADSA's professional solicitors, nationwide, must be used exclusively in Ohio. In addition, the trial court imposed a $16,000 fine upon ADSA for two separate violations of R.C. Chapter 1716. According to R.C. 1716.16(B), however, a trial court may impose a civil penalty of up to $10,000 for *each* violation. Thus, the trial court actually imposed less than was statutorily permitted. Accordingly, ADSA's fifth and sixth assignments of error are overruled.

### E. Conclusion

{¶ 96} Based on the foregoing, we overrule ADSA's six assignments of error.

## V. CRF

{¶ 97} As relevant to this appeal, the following facts were adduced at trial. CRF was one of the companies with which U.S. Marketing and NACS subcontracted, and at least as early as 1996, it was poised to do business as a professional solicitor in Ohio. CRF had contracted with AdminiServe, Inc. to staff its workforce, and rented a mail drop box at a Mail Boxes Etc. in Columbus, Ohio for the purpose of receiving charitable donations that it solicited.

{¶ 98} Sometime in 1997, Gold advocated the use of CRF to Smith, and on October 16, 1997, ADSA entered into a direct three-year contract with CRF ("1997 CRF contract"), whereby CRF would solicit donations on behalf of ADSA in Ohio and other states, using an ADSA-approved script. Pursuant to contract,

each party was "responsible for complying with its duties and obligations pursuant to all applicable laws, registration requirements, disclosure statements and regulations." The contract also provided that CRF would receive no less than 84 percent of all collected sales. Although CRF immediately began performance under this contract, it did not register with the state until April 1, 1998. That registration, however, was deficient in that CRF failed to identify the names and addresses of approximately 260 employees soliciting donations under its direction or control. Thus, those individuals were not registered or covered by CRF's surety bond.

{¶ 99} The 1997 contract was not the only one between CRF and ADSA. Two days after ADSA terminated its 1998 contract with NACS, ADSA executed a six-month contract with CRF entitled "Service Facility Agreement" ("1998 CRF contract"). The terms and conditions of those two contracts were virtually the same, except that pursuant to the 1998 contract, CRF was guaranteed no less than 88 percent of the gross revenue it raised for ADSA and deposited into ADSA's bank account.

{¶ 100} As a professional solicitor in Ohio, acting on behalf of several charitable organizations, including ADSA, CRF contacted donors and potential donors by telephone. After securing a pledge, CRF employees would follow up by sending the donor a pledge form. Approximately thousands of pledge forms were mailed to Ohio citizens each week. The pledge forms used by CRF in ADSA's campaign contained ADSA's name and not CRF's. The top portion of the form, which was to be retained by the donor for his or her records, listed ADSA's address as 3000B East Main Street, Ste. # 374, Columbus, Ohio 43209 ("the Columbus address"). The bottom portion, which was to be used by the donor when sending in his or her donation, listed ADSA's return address as 3000–B East Main Street, # 374, Columbus, Ohio 43209–3712. The difference between the two was the use of "Ste." on the top portion of the pledge form, which gave the impression ADSA had a suite in Columbus, Ohio. It was undisputed that the Columbus address listed on these pledge forms was the mail drop box rented by Jeffrey Atkins, CRF's owner, in August 1996 at a Mail Boxes Etc. It was further undisputed that CRF had exclusive control and use of that mail drop box.

{¶ 101} Several witnesses testified at trial regarding the telephone solicitations they received, as well as the pledge forms sent in response to those calls. Linda Sheppard testified that she received a solicitation call from an individual who identified himself as being from ADSA. She informed the caller that she contributed only to local charities. The caller then advised her that ADSA was a local charity. Sheppard challenged the caller by asking him to identify, by name, the sheriff from Van Wert County. The solicitor hung up in response, then called her back and uttered expletives.

{¶ 102} Roger Oglesbee from Van Wert County testified that he received a telephone solicitation from Danielle Eve, who claimed to be from ADSA. According to Oglesbee, Eve told him that his donation would provide bulletproof vests to Van Wert County deputy sheriffs. He testified that he was leery of the solicitation because his son was a Van Wert County deputy sheriff, and he had recently purchased a bulletproof vest for his son because the county claimed it did not have the funds to do so. After speaking with his son about the solicitation, Oglesbee contacted the sheriff's department and relayed the information. Oglesbee testified that Eve did not identify herself as a professional solicitor, did not state that she was from CRF, or give him ADSA's address. During the solicitation, Oglesbee requested that Eve give him a telephone number so that he could contact her about his donation; she gave him a toll-free telephone number (800–247–6278).

{¶ 103} Martha Cunningham testified that she received two pledge forms in the mail following a solicitation. The second form was a reminder to send in her donation; the address listed thereon was "3000B E. Main Street, Suite 374, Columbus, OH 43209." [9]

{¶ 104} Raymond Nelson testified that he received a solicitation call from ADSA requesting a charitable donation. Although he told the caller he would not give a donation, he received a pledge form thanking him for his donation. The pledge form contained the Columbus address.

{¶ 105} The trial court also heard from Agnes Hoehn. She stated that she received a telephone solicitation requesting a charitable donation to ADSA, which she did. Hoehn testified that she could not remember whether the caller gave ADSA's address, nor did she remember hearing the name "Charitable Resource Foundation." Hoehn did testify, however, that she was certain the caller did not identify himself as a professional solicitor.

{¶ 106} The trial court also heard testimony from county law enforcement personnel who investigated complaints regarding charitable solicitations involving ADSA. Chief Deputy Ralph Eversole of Van Wert County, Ohio, testified that he received complaints from citizens about high-pressure telephone solicitations made by Van Wert County deputies. Aware that the county was not engaged in a fund-raising drive for the sheriff's department, Eversole launched an investigation. The complaining citizens gave Eversole the pledge forms they received following their solicitations; these pledge forms listed a toll-free telephone number (800–247–6278) and contained the Columbus address. Eversole called

---

9. Unlike the first action pledge forms sent out by CRF, the reminder pledge form sent to Cunningham included the word "Suite" and not an abbreviated designation.

the toll-free telephone number and spoke with Brenda Hilou, who answered the call, about the matter.

{¶ 107} Sergeant Charles E. Insley, a road sergeant with Hancock County, testified that he also investigated complaints involving ADSA solicitations. He testified that "[t]he biggest concern was that they kept representing that they were representing our office, and that we were somehow in conjunction with them. They had our approval. That we were receiving funds. That we had received funds from them." Insley's investigation yielded a toll-free telephone number (800–247–6278), which he called. The individual answering the call told him that he had reached ADSA, and further advised Insley that ADSA was a "legitimate" organization.

{¶ 108} Deputy David Spridgeon, a deputy with Hancock County, informed Insley that he had been solicited by ADSA. Spridgeon had a toll-free telephone number in connection with his solicitation, which he gave to Insley; this toll-free telephone number turned out to be the same number that he had previously called. Insley called that number again, and was ultimately transferred to Brian Wright, CRF's chief executive officer, who identified himself as being with "North American Charitable Fundraisers" and CRF. According to Insley, Wright admitted to the misrepresentations, explaining that a new employee had made those representations in error and that measures would be taken to ensure that CRF's employees understood the appropriate manner of solicitation.

{¶ 109} Spridgeon also testified about the telephone solicitation he received. The caller stated that he was soliciting donations for ADSA and that 25 percent of Spridgeon's contribution would benefit Hancock County. Spridgeon asked for ADSA's address and was given the Columbus address. When Spridgeon told the caller he was a deputy with Hancock County and was not aware that ADSA was providing the county with funds, the caller hung up. At no time did the caller disclose that a professional solicitor was making the solicitation. Through its trial counsel, CFR stipulated that it had solicited Hancock County Deputy Sheriff David Spridgeon and admitted to the violations alleged in connection with him.

{¶ 110} Former Sheriff Larry E. Overholt from Ashland County testified that he received complaints from citizens of Ashland County about high-pressure solicitations involving ADSA. The citizens complained that the callers making the solicitations called late at night, were rude, stated they had been supplying Ashland County officers with bullet-proof vests for years, and made personal references to Overholt and the quality of his performance as Ashland County's sheriff. Overholt, along with another officer, William Risner, investigated these complaints. Overholt collected the pledge forms sent to the complainants and called the toll-free telephone number printed thereon. He spoke to Brenda Hilou, who identified herself as a representative of ADSA, and requested that she

take Ashland County "off the map for her solicitation." Despite an agreement to do so, the solicitation of Ashland County citizens did not cease. Overholt further testified that the pledge forms, from which he found the toll-free telephone number he called, contained the Columbus address.

{¶ 111} With respect to the toll-free telephone number, the testimony of Wright and Smith conflicted with the information given over the phone to Eversole, Insley, and Overholt. Smith testified that when he called that toll-free telephone number, he reached "IFG," International Funding Group, a company owned by Atkins, CRF's founder. According to the testimony given by Wright, however, the toll-free telephone number connected to NACS's office.

{¶ 112} Smith testified about the professional solicitors acting on ADSA's behalf. He admitted that he was aware that individuals not authorized to solicit donations in Ohio had done so. He further testified that there could have been as many as 7,500 professional solicitors acting on ADSA's behalf, but could not state for certain because of the Gold defendants' failure to disclose the identities of all the individuals with whom they subcontracted. The record does not disclose that Smith testified that all possible 7,500 professional solicitors were operating exclusively in Ohio. It was undisputed, however, that CRF was soliciting charitable donations in Ohio for ADSA from 1997 through 1999, and in fact, it was still serving as a professional solicitor on behalf of ADSA at the time of trial.

{¶ 113} After trial, the court issued a decision rejecting the constitutional challenges to R.C. 1716.08(A)(2) raised by CRF. The trial court found that the statute was not overbroad. It noted that protecting the public from fraud was a substantial state interest and determined that the statute was narrowly tailored in meeting that interest in that "it merely require[d] that the professional solicitor disclose in the contract the percentage of gross revenue the charity is to receive, which has been negotiated by the professional solicitors and the charity." The trial court also concluded that R.C. 1716.08(A)(2) did not violate the prior restraint because the statute did "not vest the Attorney General with 'unbridled discretion' and actually require[d] nothing from the attorney general other than ministerial actions."

{¶ 114} Soon thereafter, the trial court issued its findings of fact and conclusions of law. As germane to this appeal, the trial court found that CRF violated 1716.08(B)(1)(a) and several subsections of R.C. 1716.14(A) by failing to disclose certain information and making false representations when soliciting charitable donations. Specifically, it determined that CRF (1) failed to advise potential donors that its name was on file with the Attorney General's office, using the acronym CRF, as opposed to "Charitable Resource Foundation, Inc.," (2) failed to advise potential donors of its status as a professional solicitor, (3) failed to advise donors or potential donors of ADSA's address, (4) misrepresented that the

telephone solicitation was being made by local law enforcement personnel, and (5) misrepresented that a donor's or potential donor's contribution would confer a benefit upon local law enforcement or that ADSA had provided such benefits to local law enforcement personnel in the past and that donations were needed to continue that effort. The trial court permanently enjoined CRF from committing future violations and, pursuant to R.C. 1716.16(B), imposed fines against CRF in the amount of $20,500.

{¶ 115} CRF assigns the following errors on appeal:

■ The trial court erred in its finding that defendant Charitable Resource Foundation Inc. (CRF) committed multiple violations of R.C. Sections 1716.08(B)(1)(A) and 1716.14(A)(12) of the Charitable Solicitations Act when it failed to advise persons that its name on file was "Charitable Resource Foundation Inc."

■ The trial court erred in its finding that defendant Charitable Resource Foundation Inc. (CRF) committed multiple violations of R.C. Sections 1716.08(B)(1)(A) and 1716.14(A)(12) of the Charitable Solicitations Act when it failed to advise persons that it was conducting a solicitation as a professional solicitor.

■ The trial court erred in its finding that defendant Charitable Resource Foundation Inc. (CRF) committed multiple violations of R.C. Sections 1716.08(B)(1)(B) and 1716.14(A)(12) of the Charitable Solicitations Act when it failed to advise persons during the solicitation of ADSA's address.

■ The trial court erred in its finding that defendant Charitable Resource Foundation Inc. (CRF) committed multiple violations of R.C. Sections 1716.14(A)(2), (4), and (6) of the Charitable Solicitations Act when it advised persons that the solicitor was a local law enforcement officer or official and that its actions constituted deceptive practices in violation of R.C. Sec. 1716.14(A)(2).

■ The trial court erred in its finding that defendant Charitable Resource Foundation Inc. Committed multiple violations of R.C. Sections 1716.14(A)(2) and (5) of the Charitable Solicitations Act when it advised persons that their charitable contribution would benefit local law enforcement agencies and family members of local law enforcement officers or officials and that its actions constituted deceptive practices in violation of R.C. Sec. 1716.14(A)(1).

■ The trial court erred in its finding that R.C. Sec. 1716.08(A)(2) does not violate the Fifth and Fourteenth Amendment [sic] of the United States Constitution.

■ {¶ 116} We will address CRF's first five assignments of error together, as they present inextricably related questions. In these assignments of error, CRF argues that the trial court's decision, finding that CRF violated R.C.

1716.08(B)(1)(a) and 1716.14(A), was against the manifest weight of the evidence. CRF contends that the state failed to prove by a preponderance of the evidence that CRF made the telephone solicitations at issue.

{¶ 117} As noted earlier, a bench trial was held in this action. In reviewing a trial court's judgment following a bench trial, an appellate court is guided by the presumption that the trial court's findings are correct. *Broadstone; Patterson,* supra. Thus, this court may not substitute its judgment for that of the trial court and must affirm the judgment if it is supported by some competent, credible evidence going to the essential elements of the case. *Reilley; Koch,* supra.

{¶ 118} The first five assignments of error concern different violations of R.C. Chapter 1716; however, each is predicated upon CRF having made the telephone solicitation at issue. The trial court ascribed the telephone solicitations to CRF based upon the Columbus address listed on the pledge forms. The court also relied on the testimony from several witnesses, including Sheppard, Oglesbee, Cunningham, Nelson, Hoehn, Eversole, Spridgeon, Insley, and Overholt, as well as the exhibits introduced at trial, in reaching its determination.

{¶ 119} The gravamen of CRF's argument is that there is no direct evidence linking it to the telephone solicitations and, therefore, that the trial court erred when it determined that CRF committed the statutory violations associated with those calls. Though it is not cited by the parties herein, we find our previous decision in *State ex rel. Montgomery v. Villa* (1995), 101 Ohio App.3d 478, 655 N.E.2d 1342, instructive to our analysis. In that case, the state filed an action against several professional solicitors, alleging various violations of the solicitation-disclosure requirements in R.C. Chapter 1716. At trial, the state presented the testimony of several witnesses who received telephone solicitations for the charitable organization the professional solicitors were representing. Id. at 480, 655 N.E.2d 1342. The witnesses, however, could not identify the individuals that called them, only the charity represented by that individual. Id. at 483, 655 N.E.2d 1342. The state also introduced other evidence, including a pledge form that listed a Mentor, Ohio address, which was shown to have been a post office box rented by an agent of one of the defendant professional solicitors. Id.

{¶ 120} Following trial, the *Montgomery* court ruled on defendant's motion in limine, and held that the telephone calls at issue *were* inadmissible because they could not be properly authenticated. Id. at 480, 655 N.E.2d 1342. In granting the motion, the trial court focused upon whether the witnesses receiving the calls could identify the voices initiating the call or could identify the caller based upon the phone conversation. Id. at 484, 655 N.E.2d 1342. It noted the state's effort to authenticate the call by linking the professional solicitor with the address listed

on the pledge form but ultimately did not find that evidence to be relevant to the issue of authentication under Evid.R. 901. Id.

{¶ 121} On appeal, this court reversed that judgment. We explained:

Based upon applicable law, and a review of the evidence submitted by plaintiff, we conclude that plaintiff made a prima facie showing of authenticity, and thus the trial court erred in holding that the testimony at issue was inadmissible. While the court appears to have focused upon the witnesses' inability to identify the callers based upon the conversations, the court failed to give proper consideration to evidence introduced subsequent to the calls. However, circumstantial evidence, as well as direct, may be used to show authenticity. Moreover, the threshold standard for authenticating evidence pursuant to Evid.R. 901(A) is low, and "does not require *conclusive* proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that * * * [the evidence] is what its proponent claims it to be." *State v. Easter* (1991),75 Ohio App.3d 22, 25, 598 N.E.2d 845, 847.

* * *

Further, plaintiff presented evidence of correspondence mailed to a witness as a result of one of the telephone conversations. Specifically, in response to the solicitation call made to Terri Herbert, she was sent literature which included a return envelope bearing a Mentor, Ohio address. It was undisputed that the envelope was addressed to a post office box rented by an agent of defendant Villa. One federal court has noted that "establishing the identity of a person by evidence that he made a reply or response in a manner that was expected to be evoked by a communication made to him by another who cannot identify him is well-recognized and time-honored." *United States v. Espinoza* (C.A.4, 1981), 641 F.2d 153, 170.

In sum, we conclude that the testimony of plaintiff's witnesses, in conjunction with other circumstantial evidence, was sufficient to meet the threshold requirement for authentication. Of course, upon admission of the evidence, the trier of fact would be entitled to give such evidence as much or little weight as the circumstances warrant. We only determine that plaintiff presented sufficient preliminary evidence to satisfy the threshold admissibility requirements of Evid.R. 901.

(Citations omitted; emphasis sic.) Id., 101 Ohio App.3d at 485–486, 655 N.E.2d 1342.

{¶ 122} In a sense, this case picks up where *Montgomery* left off: the weight given by the trial court, as the trier of fact, to the testimony from witnesses, who were unable to identify CRF as the professional solicitor that contacted them, and pledge forms received by those same witnesses, listing an address determined to be that of a mail drop box leased by CRF.

{¶ 123} CRF attacks the significance placed by the trial court on the pledge forms, arguing that other professional solicitors acting on ADSA's behalf might have used the same forms. Thus, according to CRF, the trial court erred by concluding that the pledge forms were exclusive to CRF. There is no evidence to support that argument. Even if it were true, the fact remains that the Columbus address listed on the pledge form was associated with the mail drop box at Mail Boxes Etc., of which CRF had exclusive access and control. Further, as the state accurately observed, given the compensation structure involved, which usually is a percentage of the revenue raised by that particular professional solicitor, it would defy both logic and reason for donations secured by other professional solicitors to be sent to CRF's mail drop box.

{¶ 124} After reviewing all of the evidence presented at the trial court, this court finds that there was competent and credible evidence to support the trial court's conclusion that CRF was responsible for the telephone solicitations at issue. Because CRF did not assign error to the trial court's findings as to the substance of the statutory violations, we need not address whether those findings were in error. We therefore overrule CRF''s first, second, third, fourth, and fifth assignments of error.

{¶ 125} In its sixth assignment of error, CRF maintains the trial court erred in finding that R.C. 1716.08(A)(2) does not violate the First and Fourteenth Amendments to the United States Constitution by being overly broad and acting as a prior restraint. The gravamen of CRF's argument is that R.C. 1716.08(A)(2) restricts the manner in which a charity chooses to solicit donations and, therefore, impermissibly restricts protected speech. According to CRF, the statute "adds an added element of allowing the charity and the professional to contract for this percentage, and forces them to forecast, at their criminal peril, the success of a future campaign." It contends that the statute's inclusion of a percentage restriction conflicts with the United States Supreme Court's ruling in *Riley v. Natl. Fedn. of the Blind of North Carolina* (1988), 487 U.S. 781, 789, 108 S.Ct. 2667, 101 L.Ed.2d 669, which held that the use of percentages to decide whether the fee paid to a professional solicitor is proper is not narrowly tailored to prevent fraud. Id. at 787, 108 S.Ct. 2667, 101 L.Ed.2d 669. Thus, CRF asserts that R.C. 1716.08(A)(2) is overly broad because it restricts speech protected by the First Amendment and is not narrowly tailored to "further a compelling government purpose by the least restrictive means." It also asserts that the statute infringes the parties' freedom to contract and, thus, is an unconstitutional prior restraint of free speech. Lastly, CRF argues that the state has a pattern and practice of unconstitutional enforcement of the challenged statute.

{¶ 126} The state argues that R.C. 1716.08(A) is not overbroad because it does not dictate a minimum percentage that the charity must receive; rather, that

amount is "established as a result of negotiations between the professional solicitor and the charity." It further maintains that the prior-restraint doctrine is not implicated, because the doctrine applies only to governmental issuance of permits or licenses, which is not required by statute. In the alternative, the state argues that even if the doctrine applied, CRF's argument fails for the same reason that it is not overbroad. With respect to CRF's claim that R.C. 1716.08(A)(2) has been enforced in an unconstitutional manner, the state argues that this argument was not properly raised at the trial court level and, therefore, cannot be considered on appeal.

{¶ 127} This assignment of error presents a purely legal question— whether R.C. 1716.08(A) is constitutional. Accordingly, our review is de novo. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684. Before engaging in our analysis, however, we acknowledge "the universally recognized principle that a court has nothing to do with the policy or wisdom of a statute. That is the exclusive concern of the legislative branch of the government. When the validity of a statute is challenged on constitutional grounds, the sole function of the court is to determine whether it transcends the limits of legislative power." *State ex rel. Bishop v. Mt. Orab Village School Dist. Bd. of Edn.* (1942), 139 Ohio St. 427, 438, 22 O.O. 494, 40 N.E.2d 913. We also emphasize that the above-stated standards of review are applied solely as to the limited issues properly raised by CRF before the trial court. The constitutionality of the statute on other grounds is not before this court, and we express no opinion beyond what is expressly contained herein.

{¶ 128} It is well settled that charitable solicitation involves a variety of speech interests protected by the First Amendment. See, e.g., *Riley,* supra; *Secy. of State of Maryland v. Joseph H. Munson Co.* (1984), 467 U.S. 947, 959–960, 104 S.Ct. 2839, 81 L.Ed.2d 786; *Schaumburg v. Citizens for a Better Environment* (1980), 444 U.S. 620, 632–633, 100 S.Ct. 826, 63 L.Ed.2d 73. In this trilogy of cases, the United States Supreme Court struck down specific state regulations of charitable solicitation as being too restrictive to pass constitutional muster.

{¶ 129} In *Schaumburg,* supra, the United States Supreme Court invalidated a municipal ordinance that prohibited the solicitation of contributions by charitable organizations that did not use at least 75 percent of their receipts for "charitable purposes." The ordinance's definition of charitable purposes excluded solicitation expenses, salaries, overhead, and other administrative expenses. The court stated:

> [T]he 75–percent limitation is a direct and substantial limitation on protected activity that cannot be sustained unless it serves a sufficiently strong subordinating interest that the Village is entitled to protect * * *. [T]he Village's proffered justifications [protecting the public from fraud, crime, and undue

annoyance] are inadequate and * * * the ordinance cannot survive scrutiny under the First Amendment.

Id., 444 U.S. at 636, 100 S.Ct. 826, 63 L.Ed.2d 73.

{¶ 130} In *Munson,* supra, the challenged regulation prohibited charitable organizations from paying or agreeing to pay fund-raising expenses exceeding 25 percent of the total gross income. The regulation also authorized a waiver of this limitation where it would effectively prevent the organization from raising contributions. *Munson.* As in *Schaumburg,* the court held the regulation to be unconstitutional:

> The flaw in the statute is not simply that it includes within its sweep some impermissible applications, but that in all its applications it operates on a fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud. * * * It is equally likely that the statute will restrict First Amendment activity that results in high costs but is itself a part of the charity's goal or that is simply attributable to the fact that the charity's cause proves to be unpopular. On the other hand, if an organization indulges in fraud, there is nothing in the percentage limitation that prevents it from misdirecting funds. In either event, the percentage limitation, though restricting solicitation costs, will have done nothing to prevent fraud.

(Footnotes omitted.) Id., 467 U.S. at 966–967, 104 S.Ct. 2839, 81 L.Ed.2d 786.

{¶ 131} In *Riley,* supra, 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669, the court invalidated a statute that defined "the *prima facie* 'reasonable fee' that a professional fundraiser may charge according to a three-tiered schedule." Specifically, the three-tiered schedule defined a reasonable fee as up to 20 percent of receipts collected; a fee between 20 percent and 35 percent was deemed unreasonable if shown that the solicitation at issue did not involve the "dissemination of information, discussion, or advocacy relating to public issues as directed by the [charitable organization] which is to benefit from the solicitation"; and a fee exceeding 35 percent was presumed unreasonable, although a professional fundraiser may rebut that presumption by showing that the fee was necessary because the solicitation involved the dissemination of information or advocacy on public issues directed by the charity, or because the charity's ability to raise money or communicate would be significantly diminished. The court also invalidated the statute because it required professional fundraisers to inform potential donors of the average gross percentage of revenues retained "by the fundraiser for all charitable solicitations conducted in the State" for the preceding year and required professional fundraisers, but not volunteer fundraisers, to be licensed. Id. at 812, 108 S.Ct. 2667, 101 L.Ed.2d 169. Citing *Schaumburg* and *Munson,* the court held that "solicitation of charitable contributions is protected speech, and using percentages to decide the legality of the fundraiser's fee is not

narrowly tailored to the State's interest in preventing fraud." Id. at 789, 108 S.Ct. 2667, 101 L.Ed.2d 169.

{¶ 132} In these three cases, the Supreme Court recognized that states have a legitimate interest in regulating fundraising by charitable organizations and/or professional solicitors to protect against fraud and misrepresentation. See *Riley,* 487 U.S. at 790, 108 S.Ct. 2667, 101 L.Ed.2d 669 ("The interest in protecting charities (and the public) from fraud is, of course, a sufficiently substantial interest to justify a narrowly tailored regulation"); *Schaumburg,* 444 U.S. at 636–637, 100 S.Ct. 826, 63 L.Ed.2d 73 ("protecting the public from fraud, crime and undue annoyance" are substantial interests); *Munson,* 467 U.S. at 967, 104 S.Ct. 2839, 81 L.Ed.2d 786, fn. 14 (acknowledged prevention of fraud and mismanagement are state interests). Thus, "some speech by professional fund-raisers can be regulated without violating First Amendment principles." *Dayton Area Visually Impaired Persons, Inc. v. Fisher* (C.A.6, 1995), 70 F.3d 1474, 1485. In regulating this type of speech, however, a state must employ means narrowly tailored to further the aforementioned interests. *Riley,* 487 U.S. at 792, 108 S.Ct. 2667, 101 L.Ed.2d 669; *Munson,* 467 U.S. at 967, 104 S.Ct. 2839, 81 L.Ed.2d 786; *Schaumburg,* 444 U.S. at 637–639, 100 S.Ct. 826, 63 L.Ed.2d 73. The question herein becomes whether R.C. 1716.08(A)(2) is sufficiently tailored to satisfy the constitutional requirements of the First and Fourteenth Amendments.

{¶ 133} The statute challenged by CRF, R.C. 1716.08(A), provides:

Every contract entered into by any professional solicitor with any charitable organization shall be in writing, shall clearly state the respective obligations of the professional solicitor and the charitable organization, and shall contain the percentage of the gross revenue from the solicitation campaign that the charitable organization will receive. That percentage shall be either a fixed percentage of the gross revenue or a reasonable estimate of the percentage of the gross revenue, subject to and in accordance with divisions (A)(1), (2), and (3) of this section.

(1) If the compensation of the professional solicitor is contingent upon the number of contributions or the amount of revenue received from the solicitation campaign, the stated percentage of the gross revenue that the charitable organization will receive shall be a fixed percentage of the gross revenue.

(2) If the compensation of the professional solicitor is not contingent upon the number of contributions or the amount of revenue received from the solicitation campaign, the stated percentage of the gross revenue that the charitable organization will receive shall be a reasonable estimate of the percentage of the gross revenue, and the contract shall include the following:

(a) The assumptions upon which the estimate is based, which assumptions shall be based upon all of the relevant facts known to the professional solicitor

regarding the solicitation to be conducted and the past performance of the solicitation campaigns conducted by the professional solicitor;

(b) A provision that the charitable organization is guaranteed a percentage of the gross revenue that is not less than ninety per cent of the amount of the reasonable estimate of that percentage.

{¶ 134} Succinctly stated, R.C. 1716.08(A) requires that the contract between a professional solicitor and a charitable organization be in writing, state the obligations of each party, and contain the percentage of the gross revenue that the charitable organization will receive from the solicitation campaign. That percentage can either be a fixed percentage of the gross revenue or a reasonable estimate of the percentage of the gross revenue. If the parties negotiate a fee arrangement based on the latter, then the contract must contain a provision that guarantees the charitable organization receive at least 90 percent of the reasonable estimate, and describe the assumptions upon which the estimate was made.

{¶ 135} It appears from the briefing, as well as the independent research of this court, that the constitutionality of R.C. 1716.08(A) has been considered in only one previous case, *Dayton Area Visually Impaired Persons v. Fisher* (S.D.Ohio 1993), case No. C–3–91–186, affirmed (C.A.6, 1995), 70 F.3d 1474. In *Dayton Area Visually Impaired Persons,* the suit sought declaratory and injunctive relief and was brought by three plaintiffs, Dayton Area Visually Impaired Persons, Inc., the Wayne County Foster Parents Network, and the Ohio Telemarketing Association, against the state. In their complaint, the plaintiffs alleged that several provisions of R.C. Chapter 1716 violated the First and Fourteenth Amendments' guarantees of free speech and nonestablishment of religion. The district court sided with the plaintiffs regarding four of the provisions, but denied the plaintiffs' other challenges and refused to issue a preliminary injunction that would invalidate those provisions.

{¶ 136} One of the challenges denied by the district court was to R.C. 1716.08(A). The plaintiffs argued that the statutory requirements that contracts between charitable organizations and professional fundraisers be in writing, clearly state the obligations of the parties, and contain the percentage of the gross revenue from the solicitation campaign that the charity will receive impermissibly burdened the freedom of expression. Like CRF herein, the plaintiffs relied upon the Supreme Court's opinion in *Riley.*

{¶ 137} The district court concluded that *Riley* did not support the plaintiffs' argument for three reasons. First, it did not read *Riley* to "hold that *any* regulation of a professional solicitor's fee was unconstitutional"; rather, *Riley* "expressed the narrower proposition that the regulation of fees which impermissibly burdens free speech is unconstitutional." (Emphasis sic.) *Dayton Area Visually Impaired Persons* (S.D.Ohio 1993), case No. C–3–9–186. Second, the

district court found that the United States Supreme Court's decision in *Riley* "rested on its prior finding that the statute operated like the statutes in *Schaumburg* and *Munson*, 'restrict[ing] First Amendment activity that results in high costs but itself is a part of the charity's goal or that is simply attributable to the fact that the charity's cause proves unpopular.'" Id., quoting *Riley*, 487 U.S. at 789, 108 S.Ct. 2667, 101 L.Ed.2d 669. Unlike those cases, however, the district court determined, "There [had] been no showing that particular charities, or types of charities, are impacted by the requirement that their contracts take a certain form." Id. Lastly, the district court found that the statute in *Riley* regulated the actual form of speech, whereas the regulations of R.C. 1716.08(A) did not "affect protected speech" and therefore did not violate the First Amendment.

{¶ 138} In affirming the district court's treatment of the plaintiffs' constitutional challenge to R.C. 1716.08(A), the Sixth Circuit explained:

In *Riley*, the Court did conclude that statutory *limits* on the fee percentage that a charity could pay to a professional fundraiser unconstitutionally restricted free speech because "there is no nexus between the percentage of funds retained by the fundraiser and the likelihood that the solicitation is fraudulent." *Riley*, 487 U.S. at 793, 108 S.Ct. 2667. In this case, however, the challenged statute does not attempt to dictate an appropriate fee level to be included in the contract. Instead, the provisions of O.R.C. § 1716.08(A) simply require the *disclosure* of such information so that interested individuals can make an informed decision on where to direct their charitable dollars. See also *Famine Relief Fund v. West Virginia*, 905 F.2d 747, 752 (4th Cir.1990) (state can require disclosure of percentage fee in contract because such information only provides greater detail and description to information already disclosed in financial statements that can be required by state law to be filed with a state agency). The district court did not abuse its discretion in concluding that the plaintiffs failed to demonstrate a substantial likelihood of success on the merits of this claim.

(Emphasis sic.) *Dayton Area Visually Impaired Persons*, 70 F.3d at 1485.

 {¶ 139} We agree with the district court's determination that R.C. 1716.08(A)(2) is distinguishable from the state or local laws invalidated by the Supreme Court in *Riley*, *Munson*, and *Schaumburg*, as the Ohio statute does not categorically restrain the fee that can be paid to a professional solicitor by a charity. Here, the challenged statute allows the charity and the professional solicitor to negotiate the percentage that will be paid to each party; it does not dictate any amount, nor does it restrict or limit the agreed upon percentage. The parties have the freedom to decide the "reasonable estimate of the percentage of the gross revenue" that the charity will receive. We also find it is significant that

while CRF challenges R.C. 1716.08(A)(2) to the extent it requires the charitable organization to receive "a reasonable estimate of the gross revenue," it does not take issue with the "90 percent" figure directly.

{¶ 140} We do not agree, however, that R.C. 1716.08(A)(2) is purely a disclosure statute. Although there is that element, the statute does, in the slightest of ways, restrict the manner in which a charitable organization and professional solicitor can express their fee arrangement. Notwithstanding, we find that the parties' freedom to choose the percentages and figures involved saves the statute from unconstitutionality.

{¶ 141} Further, CRF's argument that the statute forces the parties to "forecast, at their criminal peril, the success of a future campaign" falls short. R.C. 1716.08(A)(2)(a) requires that the assumptions upon which the parties base the reasonable estimate take into account all "relevant facts" known by the professional solicitor at the time the contract is entered into, including the professional solicitor's past successes. Thus, the statute does not require the parties to take a shot in the dark but, rather, to engage in a responsible decision-making process. In fact, R.C. 1716.08(A)(2)(a) can be reasonably viewed as a complement to the fiduciary responsibilities of the charitable organization and professional solicitor, by ensuring that the business decision is borne of reasonable analysis.

{¶ 142} There is no doubt that "the interest in protecting charities (and the public) from fraud is, of course, a sufficiently substantial interest to justify a narrowly tailored regulation." *Riley*, 487 U.S. at 790, 108 S.Ct. 2667, 101 L.Ed.2d 669. R.C. 1716.08(A)(2) does not impose any restriction upon the percentage paid to a professional solicitor, nor does it declare any fee amount unreasonable. Further, the charity and the professional fundraiser are under no obligation to choose the fee arrangement set forth in R.C. 1716.08(A)(2). Instead, they may choose the option contained in R.C. 1716.08(A)(1). Thus, considering the statute in question against the constitutional backdrop of *Riley, Munson,* and *Schaumburg,* we find that R.C. 1716.08(A)(2) is a "more benign and narrowly tailored" option than the regulations at issue in the foregoing cases.

{¶ 143} CRF's challenge to the statute on the basis it acts as a prior restraint fails for the same reason. With respect to CRF's claim that the state's enforcement of R.C. 1716.08(A)(2) is unconstitutional, we agree with the state that this issue is not properly before us. CRF raised this issue in its reply brief, and it was the subject of the state's motion to strike, which the trial court granted on April 1, 2004. As there was no appeal from that order, we will not address CRF's argument.

{¶ 144} As a final matter, we note that at least eight other states have provisions similar to R.C. 1716.08(A)(2): Colorado (Colo.Rev.Stat. 6–16–104.6), Florida (Fla.Stat. 496.410), Georgia (Official Code.Ga. 43–17–3), Indiana (Burns Ind.Code 23–7–8–2), Kansas (Kan.Rev.Stat. 367.668), Mississippi (Miss.Code 79–11–523), New Hampshire (N.H.Rev.Stat. 7:28–c), North Carolina (N.C.Gen.Stat. 131F–16), and Pennsylvania (10 Pa.Stat. 162.9). Most notable is North Carolina, which amended its statute after the Supreme Court's decision in *Riley* to its current form, requiring contracts between professional solicitors and charitable organizations to include a provision that requires that the percentage retained by the charitable organization be expressed in terms of a fixed percentage or a reasonable estimate thereof. N.C.Gen.Stat. 131F–16(g)(4). The independent research of this court failed to disclose any constitutional challenges to the provisions in the aforementioned statutes that are similar to R.C. 1716.08(A)(2).

{¶ 145} Based on the foregoing, we find that R.C. 1716.08(A)(2), unlike the statutes at issue in *Riley, Schaumburg,* and *Munson,* is more narrowly tailored, as it allows the charitable organization and the professional solicitor to negotiate the percentage of gross revenue retained by the charity. Therefore, we hold that it passes constitutional muster. Accordingly, we overrule CRF's sixth assignment of error.

## VI. CONCLUSION

{¶ 146} As set forth above, we overrule each of appellants' assignments of error and affirm the judgments of the Franklin County Court of Common Pleas.

Judgments affirmed.

FRENCH and CHRISTLEY, JJ., concur.

CHRISTLEY, J., retired of the Eleventh Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.